# MILTON GORDON *v.* STATE OF MARYLAND

### [No. 366, September Term, 1967.]

*Decided October 10, 1968.*

The cause was argued before MURPHY, C.J., and ANDER-SON, MORTON, ORTH, and THOMPSON, JJ.

*Karl G. Feissner* and *Thomas P. Smith,* with whom were *William L. Kaplan* and *Raymond S. Smithurst, Jr.,* on the brief, for appellant.

*Donald Needle, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, William A. Linthicum, Jr., State's Attorney for Montgomery County,* and *William M. Cave, Assistant State's Attorney for Montgomery County,* on the brief, for appellee.

MURPHY, C.J., delivered the opinion of the Court.

The appellant Milton Gordon, an attorney and a partner in the law firm of Gordon & Myers, with offices located in Montgomery County, Maryland, was convicted of embezzlement on October 4, 1967 by a jury in the Circuit Court for Somerset County, the trial having been removed to that jurisdiction from the Circuit Court for Montgomery County at appellant's request. He was sentenced to five years under the jurisdiction of the Department of Correction.

The indictment returned against appellant contained three counts—embezzlement, larceny after trust, and larceny. The larceny count was abandoned by the State at the trial, and the jury returned a not guilty verdict on the count charging larceny

after trust. The embezzlement count of the indictment, upon which appellant was convicted, charged that on September 8, 1966 and then continually until December 23, 1966, he did "unlawfully embezzle from Raymond Francis Scholl, Jr. and Mary E. Scholl" the sum of $13,895.04, "in violation of Article 27, Section 129, of the Annotated Code of Maryland." Insofar as pertinent, Section 129 provides:

> "Whosoever * * * being employed for the purpose or in the capacity of a cashier, servant, agent, officer or clerk, by any person or body corporate shall fraudulently embezzle any money * * * which * * * shall be delivered to or received, or taken into possession by him, for or in the name or on account of his master or employer, shall be deemed to have feloniously stolen the same from his master or employer, although such money * * * was not received into the possession of such master or employer, otherwise than by the actual possession of his cashier, servant, agent, officer, clerk or other person so employed, * * *."

The facts essential to a determination of the merits of the appeal are these: In August of 1966 Mr. and Mrs. Clarence L. Ranck listed their residence property in Rockville, Maryland, for sale with R. L. Smith, a real estate broker. The Ranck property was then encumbered with a first trust (mortgage) held by Emigrant Industrial Savings Bank (Emigrant) in the approximate amount of $14,000.00. Within a day or so after the property was listed, Smith procured Raymond and Mary Scholl as purchasers for the Ranck property, and a contract of sale was concluded, the purchase price being $19,950.00. At Smith's suggestion, the Scholls went to the offices of Bogley, Harting, Mahoney and Lebling, Inc. (Bogley), a mortgage lending firm, to obtain the necessary financing for the property. Bogley agreed subject to certain conditions, to make a VA guaranteed loan to the Scholls in the amount of the purchase price of the property, viz., $19,950.00.

Settlement for the property was to be held at the law offices of Gordon & Myers, and that firm assigned its case number T1179 to the transaction. A title search of the property was

initiated by Gordon & Myers, as a result of which the firm filed its "Report on Title," certified as of August 19, 1966, showing that the Rancks had a marketable fee simple title, subject to an outstanding deed of trust. An interim title insurance binder was then issued by Lawyers Title Insurance Company (Lawyers Title) to Bogley, the prospective lender.

On August 22, 1966 Bogley wrote to Gordon & Myers stating that it had agreed "subject to the conditions listed" to make a VA loan to the Scholls in the amount of $19,950.00. In its letter Bogley set out the terms of the loan, stated that settlement was to be held in August of 1966, specified that "all papers" were to be prepared by Gordon & Myers, directed that the current VA standard forms of deed of trust and note be used and that the note was to be made payable to Bogley, designated the names of the trustees of the deed of trust and outlined certain provisions to be included in that document. The letter further stated that title was to be in fee simple "good of record in the borrowers and subject to foregoing deed of trust as first lien"; that title insurance was to be obtained insuring Bogley, and that the binder was to be marked up opposite existing liens showing the same to be "satisfied" or "to be satisfied out of proceeds." Bogley's letter further directed that certain documents, including the "marked up" title insurance binder, be mailed to them after settlement and specified that "The closing and disbursement of this loan is subject to all aspects of title and loan papers being satisfactory to us and in such form that the VA will issue its Certificate of Guaranty for the loan." In its letter, Bogley set out various charges to be made at the time of settlement, directing that these charges "be collected for our account at settlement." The letter concluded by stating that Bogley's loan check would be issued; that the deed of trust was not to be recorded before Bogley's check was received; that Gordon & Myers was to "advise of any unusual circumstances surrounding this case that come to your attention that might preclude complete settlement of this case within seven (7) days of the receipt of our check"; and that if there should be any deviation from these closing conditions, the case was not to be closed since "it will be necessary that you consult further with this office."

Settlement was held on August 24, 1966 at the offices of Gordon & Myers. Edward Dacy, a salaried employee of the firm, acted as the settlement attorney in closing the transaction. At the settlement a deed conveying the property from the Rancks to the Scholls was executed dated August 24, 1966. The Scholls executed a deed of trust note in the amount of $19,950.00 and also a deed of trust in favor of Bogley on the same date. Separate settlement statements, one for the Rancks and one for the Scholls, were prepared, showing the financial details of the transaction. As the seller, Ranck's statement showed a brokerage commission and, *inter alia,* a first mortgage or trust payoff of $13,095.04, a charge for the recording of the release, and a balance due the Rancks of $3,034.05. The buyer Scholl's statement showed, among other things, charges including a VA funding fee, a loan commission, a title examination and certification fee of $122.50, together with a title insurance and application fee of $64.75. It showed that the buyers were credited with the amount of the mortgage or trust to Bogley, namely $19,950.00 (less a $300.00 deposit previously paid). The "balance due to settle" paid by the Scholls at the time of the settlement was $651.39.

At the settlement the parties executed a document acknowledging that "until funds have been received (from Bogley) there will be no disbursement or processing of this case."

An endorsement to the title insurance binder containing amendments pertaining to the amount of loan, selling price and other details was issued on August 26, 1966 and the original copy of Gordon & Myers' "Report on Title" contained a handwritten notation that the outstanding Ranck mortgage (to Emigrant) was to be paid out of the loan proceeds.

The various settlement documents were forwarded to Bogley for review in accordance with its previous instructions. After reviewing the documents, Bogley forwarded its check dated September 8, 1966, payable to Gordon & Myers, to the offices of Gordon & Myers, the check being in the amount of $18,130.35, representing the amount of the loan less certain of the charges made at the time of settlement. Bogley's check was deposited on the same date in Gordon & Myers' real estate escrow account in the State National Bank of Bethesda.

The firm of Gordon & Myers consisted of two partners, the appellant and Mitchell Myers, and two salaried attorneys Edward Dacy and Donald Wasserman. Myers specialized in negligence and domestic cases and had nothing whatsoever to do with real estate settlements, the appellant and Dacy handling all such work, with Dacy doing approximately 80% of the actual settlements. Appellant had established the office procedure for the handling of settlements and disbursement of funds. While all four attorneys had authority to sign checks on the firm's real estate escrow account, the recordation of title instruments and disbursements of settlement funds could only be made upon appellant's authority, and this was particularly well established office procedure in connection with paying off prior mortgages or trusts.

Under the normal operating procedure of Gordon & Myers, a secretary or the accountant, after receiving the lender's draft, and after the draft had cleared the bank, would draw the necessary checks on the firm's escrow account necessary to have the legal documents recorded; and after recordation had been effected, the other checks were made up in accordance with the settlement statements.

Following receipt of Bogley's check covering the Ranck-Scholl settlement, checks were drawn on the firm's escrow account on September 8, to cover taxes, documentary stamps and for recordation of the deed and deed of trust. These instruments were recorded on September 16, 1966. A commission check to the real estate broker was issued on September 21, 1966. The Rancks received the money due them as sellers at some unspecified time and from an unspecified source. No disbursement was ever made to Emigrant to pay off the Ranck trust.

On November 23, 1966, Lawyers Title purchased the deed of trust note covering the property from Emigrant for $14,-564.72. Neither the firm of Gordon & Myers, nor the appellant, or anyone else connected with the firm, ever paid anything on the Emigrant note.

The ledger sheets of the State National Bank pertaining to the real estate escrow account of Gordon & Myers showed that from October 24, 1966 until December 23, 1966, when the account was closed, it was with the exception of several days in

October, overdrawn. When closed on December 23, 1966, it showed a deficit of $8,147.11.

Dacy testified at the trial that he learned on October 28, 1966 that the firm had been removed from Lawyers Title's list of "approved attorneys," immediately after which he "had a conversation" with appellant so as "to confirm certain things in my mind, and, in fact, what he said was that it was a stupid thing to do, it seemed smart at the time." When asked what appellant was referring to by this statement, Dacy testified that appellant was referring to the "shortage in the escrow account"; that their conversation was "rather rambling" and appellant said, "My greatest mistake was in calling Lawyers Title Insurance Corporation to go over the escrow shortages." Asked whether appellant ever indicated that anyone other than himself was responsible for the shortage, Dacy testified "he never mentioned any other names at all."

With respect to the Ranck-Scholl settlement, which he handled for Gordon & Myers, Dacy testified that it was not his responsibility to ascertain whether the lender's check had been received, or whether the disbursement of funds had actually been made. He testified that these were matters for the bookkeeper or secretary and that in accordance with the normal office procedure, the checks would have been drawn and presented for appellant's approval before being signed. Dacy admitted that he signed a large volume of checks on the firm's real estate escrow account, and that he signed all the checks chargeable to the Ranck-Scholl settlement. He testified that he did not recall signing such a check to pay off Emigrant's first trust or mortgage. He also testified that there was no money due the Scholls at the conclusion of the settlement.

Benjamin Dulaney, an attorney representing Lawyers Title, testified that on November 23, 1966, he met with appellant and his attorney and officers of Lawyers Title; that the purpose of the meeting was "to attempt to ascertain whether Lawyers Title could salvage any of the funds which had been paid out because of the shortages in the Gordon & Myers escrow account"; that he told appellant that the known shortage was approximately $350,000.00 and that additional claims were outstanding which would bring these losses up to $500,000.00; and that in response

to his question of appellant as to "where the money had gone to," appellant said:

"* * * that in 1961 he was in Florida on his own, and that on May 26, 1961 he was hospitalized and operated on for a disk condition in his back, and that was the first time that he started using escrow funds, and he used them for his personal expenses, somewhere between one and five thousand dollars.

"He stated that in 1962 he advanced certain monies from the escrow account to clients in order to settle cases that he was settling in the office; that in 1962 he used some escrow funds to supplement his personal income; that in 1962 he was also paying all or part of his office overhead out of his escrow account; and that in 1962 or '63 he was some 40 or 50 thousand dollars in the hole as far as his escrow account was concerned; that he made a loan, repaid all or a major part of what he had withdrawn from the escrow account, and at that time was only about 10 or 15 thousand dollars short; that subsequently he repaid the loan out of the escrow account, so that the amount of the shortage again increased.

"He stated that he did a lot of traveling in 1963 for Intercontinental Motels, a corporation which sold stock publicly; and in Florida he became involved with a confidence man in Florida by the name of Bonsath; and became involved in a North Carolina Company—Credit Loans, Incorporated, I believe; and he also became involved in the Five Points National Bank in Florida, and it was there that he thought the bulk of the money had gone."

After stating that he couldn't make appellant's explanation of the finances "total," Dulaney further testified that he again asked appellant "Where it went," and appellant responded, "Well, I frittered it away." Dulaney testified as to his further conversation with appellant as follows:

"He went into several smaller transactions from the escrow account; one where he had in North Caro-

lina—he said North Carolina—one of the more larger ones, where he was a part-purchaser of a small business investment corporation known as Frontier's Capital Corporation; in Laurel, Maryland in which he paid $10,000.00 cash which he also loaned from the escrow account; also loaned from the escrow account $5,000.00 to a F.B.W. Fireplaces, and that concern went broke and the loan was never repaid; and he also loaned money to a man named Fishkin on accounts receivable, and that was probably one to three thousand dollars to his recollection—that was an uniform business, and that also went broke, and the note was not paid.

"In 1965, having suffered these losses in Florida, Mr. Gordon stated that he realized that wheeling and dealing was no good, started concentrating on title work, expanded his office, which increased the overhead and also the income.

*"He stated that the checks from the escrow account were put into Milton Gordon's own special account, which was merely a bookkeeping account on his office books, and then was utilized for whatever purpose he saw fit.*

"In addition he had paid a man named Biddle, Victor Biddle, in a billing system business for doctors, and the firm paid his salary and it came out of the escrow account, $225.00 a week, and Mr. Gordon was to own part of the business, this amounted, over a period of years he said, to $9,000.00; and there was a man named Rhombrun, he had loaned some 20 or 25 thousand dollars to him; that he had advanced some 20 thousand dollars to a family realty company known as Aragonas, and there were several brothers and a father in that business; and he stated that the only assets that he had would be the repayment of some of these loans or advances, which he thought would amount to as much as $140,000.00." [Emphasis Supplied.]

Dulaney further testified that appellant told him that in 1965 he first began deliberately not paying off first trusts; that prior

to that time, "he would just take money out of the escrow account without purposely or consciously not paying off trusts"; and that he began paying only the monthly or quarterly payments on the trusts as they came due.

Appellant's motion for a judgment of acquittal was denied by the court. The appellant did not testify and presented no evidence in his own behalf. As heretofore indicated, the jury found him guilty on the embezzlement count of the indictment.

## I

Appellant contends that the lower court erred in failing to grant his motion for judgment of acquittal on the embezzlement count because the evidence presented by the State was insufficient to prove the crime of embezzlement from the Scholls under Section 129 of Article 27 of the Maryland Code, as charged in the indictment. He urges that under the express language of Section 129, the State was required to show, first, that he was either a cashier, servant, agent, or clerk of the Scholls and, secondly, that the funds in question had been received by him "for or in the name or on account of his master or employer" (the Scholls).

Appellant maintains that neither he individually nor the firm of Gordon & Myers was a cashier, servant, agent, or clerk of the Scholls; that if occupying any of these designated positions it necessarily could only be as an agent; that if an agent, Gordon & Myers was the agent of the Rancks, their services having been engaged by Smith, the Rancks' real estate broker, or that the firm could possibly be considered as a sub-agent of the Rancks' mortgagee, Emigrant; and that to justify a conviction under Section 129, the accused must be shown to be the agent of the principal having title to or a special property interest in the misappropriated funds. Appellant further urges that in no event could he personally be considered as an agent in the Ranck-Scholl transaction, as it was the firm's business, and not his own, and that moreover the transaction was handled by the firm's employee Dacy at a time when he, the appellant, was away in Florida.

Appellant next argues that even if he or the firm of Gordon & Myers was at one time the agent of the Scholls, it was in the

limited capacity of an escrow holder of funds having the duty to record the deed and deed of trust, after which it was to make disbursement of the funds to pay the Rancks, to pay Emigrant, and to satisfy the other obligations in accordance with the settlement statement; that as the Scholls and Bogley had placed only money into the escrow arrangement, when the recorded deed and deed of trust had been delivered to the Scholls and Bogley, respectively, any agency of Gordon & Myers or of the appellant personally, as to them, was thereby terminated; that as this termination occurred on or about September 16, 1966, there was nothing thereafter for the escrow holder to do for the Scholls; that it was the Rancks and Emigrant who, after recordation of the title instruments, were to receive the funds deposited in escrow, and that at the time of the termination of the agency of the Scholls in September of 1966, the escrow account of Gordon & Myers was sufficient to pay off Emigrant, so that at the time of the alleged conversion in October of 1966, no principal-agent relationship existed between the appellant and/or Gordon & Myers and the Scholls.

Appellant next contends that under Section 129, an allegation of ownership is an essential averment in an indictment for embezzlement, and while any legal or special property interest may suffice, it must be shown that such interest was vested in the injured person at the time the offense was committed. He argues that the legal interest in the escrow funds passed to Emigrant at the time of the conversion; that Bogley's check was not sent to Gordon & Myers until after the deed from the Rancks to the Scholls, and the deed of trust from the Scholls to Bogley, had been signed; that Gordon & Myers, under their office procedure, would in no event disburse the money from the lender's check until such time as it cleared the bank, so that the Scholls had no interest in the funds once the title instruments had been signed and recorded; and that once recordation occurred, Gordon & Myers' only obligation was to pay Emigrant. It is upon this predicate that appellant suggests that the embezzlement, if any, was from the Rancks who he contends acquired a special property right to have the money owed paid to Emigrant, or that the embezzlement was from Emigrant, who also had a property interest in the money.

In summary then, it is appellant's position that Bogley and/or the Scholls retained an interest in the money only until the deed and deed of trust were recorded and delivered to the respective parties in September of 1966; that these events occurred prior to the established dates of the conversion (October 21-24, 1966) ; that at the time of the conversion, the ownership of the misappropriated funds was vested in the Rancks or Emigrant, and that Gordon & Myers, as the escrow holder of the funds, then had one remaining duty—to pay off the Rancks and Emigrant. Appellant urges that as an allegation of ownership is a necessary averment in an embezzlement indictment, and as it is an essential element in proof of the crime of embezzlement that such ownership be in the injured party at the time of the fraudulent conversion, proof of ownership in another at the critical time constitutes a fatal deficiency in the proof.

Embezzlement is a statutory offense designed to penalize those fraudulent conversions of money and other personal property which could not be prosecuted at common law as larceny because there was no trespassory taking. See Clark & Marshall, *Crimes,* (6th Edition) Section 12.18; Wharton's *Criminal Law & Procedure* (Anderson Edition), Section 514. While the crime in general consists of the fraudulent appropriation of personal property by a person to whom it has been entrusted, *League v. State,* 1 Md. App. 681, where an embezzlement statute such as Section 129 applies only to designated persons occupying particular relationships, it is essential in proving the offense to show the existence of such a relationship so as to bring the accused within the ambit of the statute. See Clark & Marshall, *Crimes,* Section 12.22, and Wharton, Section 514, and cases there cited.

By its express terms, Section 129 requires proof that the accused (a) was employed as a cashier, servant, agent, clerk or officer by a person or body corporate; (b) that in such capacity he received personal property "for or in the name or on account of his master or employer"; and (c) that he thereafter fraudulently embezzled such property. The statute does not require that the embezzled property be entrusted to the accused directly by the master or employer; it may be entrusted by another person on his behalf.

Section 130 of Article 27 provides that an indictment for embezzlement shall be sufficient if in the following form:

> "That A-B on the ...... day of ............, 19..,
> in the County (City) aforesaid did feloniously embezzle from C-D the sum of ............. Dollars
> current money (or an enumeration of articles embezzled as the case may be), * * *."

The Court of Appeals of Maryland recently pointed out in *Loker v. State*, 250 Md. 677, that while there is no specific requirement in Section 129 "that ownership of the money embezzled be either alleged or proved" nevertheless it was judicially determined in *State v. Tracey*, 73 Md. 447, "that the ownership of such money must be alleged in the indictment * * * because the statute makes its violation larceny and the common law crime of larceny required an allegation of ownership of the stolen property." The court in *Loker* held further that the allegation of ownership of the embezzled funds could be supported "by proof of any legal interest or special property in the goods."

That an attorney may be an agent within the meaning of Section 129 is settled beyond question. *Dick v. State*, 107 Md. 11. While the record does not disclose the exact origin of Gordon & Myers' employment in connection with the Ranck-Scholl real estate transaction, it is entirely clear that the firm undertook to act as attorneys to close the transaction in accordance with their usual operating procedures. The evidence does not specify at whose request Gordon & Myers initiated a title examination of the property, or at whose request it issued its "Report On Title," which showed a marketable fee simple title in the Rancks, subject to an outstanding deed of trust.[1] Although it appears that the Scholls did not directly engage Gordon & Myers as their attorneys, it is quite clear that the firm undertook to close the transaction in accordance with Bogley's instructions and directions of August 22, 1966, in pursuance of which Gordon & Myers, *inter alia*, was to prepare "all papers," as specified by Bogley; assure a fee simple title to the Ranck property "good

---

1. The Scholls, as borrowers, paid for these services at the time of settlement.

of record in the borrowers," subject only to Bogley's deed of trust as a first lien; and, to accomplish this end, to pay off the existing mortgage indebtedness on the property owed to Emigrant. Under these circumstances, we think in accepting this authorization to act in closing the Ranck-Scholl transaction Gordon & Myers assumed, at the least, an obligation on behalf of the Scholls to satisfy the Emigrant lien out of the proceeds of Bogley's check and thus to assure the Scholls good title to the property. We think it implicit in the transaction that the Scholls acquiesced in and tacitly assented to Gordon & Myers undertaking this responsibility on their behalf, and that Gordon & Myers and the Scholls thereby stood in the implied legal relationship of principal-agent within the ambit of Section 129 —a relationship that was to continue until Gordon & Myers paid Emigrant, on the Scholls' behalf, from the proceeds of the loan from Bogley. We therefore believe that when the deficiency in Gordon & Myers real estate escrow account first became apparent in October of 1966, the implied agency relationship between the parties was still in effect, and did not terminate immediately after the recordation of the title instruments on September 16, 1966.[2]

As appellant was that person in the firm of Gordon & Myers under whose direction and ultimate authority the Ranck-Scholl transaction was closed, we think that he personally could be deemed an agent within the meaning of Section 129 who received "for or in the name or on the account of" the Scholls the money to cover the Emigrant indebtedness—money which the proof showed he personally thereafter fraudulently embezzled.

It is equally clear to us that when the deed of trust from the Scholls to Bogley's trustee was recorded, the Scholls became liable for the money advanced by Bogley. Under these circumstances, it is plain that the evidence satisfactorily showed that the Scholls had the requisite legal interest or special property right in the embezzled funds at the time of the conversion. See *Loker v. State, supra.*

---

2. The fact that the actual deficit in the escrow account did not appear until October 21-24, 1966 does not necessarily mean that the & Myers received Bogley's check.
Scholl conversion did not occur at some earlier date after Gordon

## II

Appellant next contends that the testimony of the State's witnesses Dacy and Dulaney relative to the various admissions which he made to them as to his conversion of escrow funds between 1961 and 1965 was improperly admitted into evidence and constituted prejudicial error. More specifically, he asserts that as he was indicted only for embezzling $13,895.04 from the Scholls, the evidence of his prior defalcations, admitted over his objection, was incompetent and inadmissible upon the principle which prohibits the introduction of evidence of other crimes to show the commission of the crime charged in the indictment.

The general rule is that "when a man is put upon trial for one offense, he is to be convicted, if at all, by evidence which shows that he is guilty of that offense alone, and that, under ordinary circumstances, proof of his guilt of one or a score of other offenses in his lifetime is wholly excluded." *Wentz v. State,* 159 Md. 161, 164. The rule is not, however, without exceptions and evidence of other crimes of the same character is generally allowed when it tends to show the guilty knowledge of the offense for which the defendant was indicted, or of other offenses so connected that they form parts of one entire scheme or transaction from which may be gathered the purpose or intent with which the act was done for which the accused was then being tried. *Meno v. State,* 117 Md. 435. As more particularly crystalized in *Cothron v. State,* 138 Md. 101, 110, the rule is that evidence of other crimes is admissible to prove the specific crime charged when such evidence tends to establish (1) motive, (2) intent, (3) absence of mistake or accident, (4) a common scheme or plan embracing the commission of two or more crimes so related to each other that proof of one tends to establish the other, and (5) the identity of the person charged with the commission of the crime on trial. To like effect, see *Jones v. State,* 4 Md. App. 445; *Thomas v. State,* 3 Md. App. 708; *Gilchrist v. State,* 2 Md. App. 635; *Loker v. State,* 2 Md. App. 1; *Gorski v. State,* 1 Md. App. 200.

To prove the fact of the fraudulent embezzlement of the Scholl funds, and of appellant's criminal agency in connection therewith, it was necessary that the State show in substance that it

was appellant's illegal activities, and not those of someone else, that caused the deficit in the firm's escrow account. In showing that appellant's failure to pay Emigrant with the funds entrusted to him on behalf of the Scholls was not due to neglect, mistake, bad bookkeeping, or other cause not criminal, it was necessary for the State to establish more than the mere fact of the deposit of the Scholl funds in Gordon & Myers' escrow account, the existence one month later of a deficit in that account, and the fact that Emigrant was not paid with the Scholl funds. The State was required to show, by proper evidence, appellant's criminal responsibility for that deficit and thus inferentially to prove his fraudulent conversion of the Scholl funds. In doing so, it was wholly proper to permit evidence of other transactions involving the escrow account in order to give meaning to and show the underlying cause of and reason for the deficit. In these circumstances, a specific evidentiary showing through appellant's own admissions that he had been fraudulently converting funds from the firm's escrow account for a number of years, and particularly that he had, since 1965, been doing so and deliberately not paying off first trusts, was clearly permissible in that, at the least, (a) it identified appellant, and not someone else, as the guilty person, (b) demonstrated his fraudulent intent and, conversely, the absence of mere mistake or neglect in his involvement with the deficit in the escrow account, and (c) showed a specific design, scheme, and plan to embezzle funds from the account—a continuing series of conversions—so related and connected with the embezzlement of the Scholl funds that proof of the former tends to establish his responsibility for the latter. See *Wigmore on Evidence,* Third Edition, Sections 300-332. In concluding that the challenged evidence was properly admissible, we have considered, but found inapplicable to the facts of this case, those cases relied upon by appellant to support his argument that the evidence of his prior defalcations was inadmissible.[3]

---

**3.** Appellant places principal reliance upon *Young v. State,* 152 Md. 89. In that embezzlement case, however, the prior conversions were not connected in any way with, or related to, the embezzlement for which the defendant was being tried, nor were they part of a common plan.

### III

Appellant contends that the court erred in failing to adequately instruct the jury as to the applicable law. The record indicates that the case went to the jury on two counts, embezzlement and larceny after trust, and that the court limited its instructions on the embezzlement count as follows:

> "I am going to read to you what we understand to be the elements of the crime of embezzlement, and that is the First Count, and that is, to make out a case of embezzlement it is usually necessary to show that the property was, within the protection of the statute, belonging to someone other than the accused, that the accused acquired it lawfully and occupied the designated fiduciary relation, and converted the property with a fraudulent intent. You must, ladies and gentlemen, to find him guilty of embezzlement, find that there was an intent to fraudulently convert this property and use it for his own benefit, other than use it for what it was placed in his hands in the first place to do, and that was, as I understand the testimony, to pay off a mortgage, which the mortgage holder at that time was Emigrant Industrial Savings Bank. * * * As I remember the testimony, the mortgage money initially came into the account of Gordon & Myers, and did not find its way where it should have gone, to the Emigrant Industrial Savings Bank, to pay off on a mortgage."

Appellant entered twenty-one exceptions to the charge. The court declined to modify or amplify its instructions and the case went to the jury. The jury retired briefly, then returned and requested the court to further instruct it as to "the difference between embezzlement and larceny after trust and to permit us to see the law books concerning each." To this inquiry, the court stated:

> "Instead of turning over the law books to you, we are going to read to you the statutes of embezzlement and larceny after trust."

The court then read the applicable statutes to the jury.

One of appellant's principal exceptions to the charge was that the court misstated the law when it instructed the jury that to make out a case of embezzlement "it is usually necessary to show that the property was, within the protection of the statute, belonging to someone other than the accused." Appellant contends, as he did throughout the course of the trial, that to prove him guilty of embezzlement, the State had to show that he unlawfully embezzled the money "from Raymond Francis Scholl, Jr. and Mary E. Scholl," as charged in the indictment, and not merely that the embezzled funds belonged "to someone other than the accused," as the court charged the jury.

The record discloses that in arguing the merits of his motion for a judgment of acquittal appellant maintained that under the evidence in the case, "The Scholls had no interest in the money whatsoever"; and that "The interest, as I think again, the Loker case,[4] is to the effect that there must be a legal title or a special property interest * * *."

In his request for instructions to the jury, appellant specifically asked the court to charge that to sustain the embezzlement count, it was necessary for the State to show that he "acquired possession of the funds lawfully, for the use and benefit of Mr. and Mrs. Scholl"; that "Proof of ownership, as laid in the indictment, is an essential factor to justify the conviction"; and that as "the State has laid ownership of the property in Mr. and Mrs. Scholl," it must prove beyond a reasonable doubt that the Scholls "had an actual legal interest in the funds and not a mere claim or expectation of interest."

After the court declined to instruct the jury, as requested, the appellant specifically excepted to its failure to do so and asked again that the substance of his requested instructions be given, and particularly that the jury be instructed "that the State must show that the funds were secured for the use and benefit of Mr. and Mrs. Scholl, and not any individuals." Appellant then told the court that proof of ownership in the Scholls

---

4. Referring to *Loker v. State*, 2 Md. App. 1, wherein, at page 24, we stated that "failure to prove ownership as laid in the indictment is immaterial."

was "a major aspect of the case" and that he excepted "strenuously, vigorously, and sincerely to the failure of the court to say that there is a requirement for the State to prove the ownership of the property in Mr. and Mrs. Scholl."

Underlying these requests for instructions was one of appellant's primary defenses to the embezzlement count, manifest from the very beginning of the trial, that at the time of the conversion the embezzled funds were not owned by the Scholls, nor did they have any legal interest in them; but that such funds were owned by Bogley, or Emigrant, or even the Rancks. Indeed, appellant also requested an instruction to the effect that if the jury found that he had been entrusted by Bogley with the money to pay off the trust to Emigrant, and then to pay the balance to the Rancks, then it must find that the Scholls neither owned nor had any property right in the embezzled funds.[5]

It is incumbent upon the court when requested in a criminal case to give an advisory instruction on every essential question or point of law supported by the evidence. *Malloy v. State,* 4 Md. App. 420; *Huber v. State,* 2 Md. App. 245; *Tipton v. State,* 1 Md. App. 556. We think the court committed error when it refused to instruct the jury, as requested in substance by the appellant, that to prove embezzlement under Section 129, the State was required to prove "ownership" of the embezzled funds, as laid in the indictment, *viz.,* that the proof, in order to sustain the embezzlement count, must show that the money was owned by the Scholls, at least in the sense that they had any legal interest or special property right in it at the time of the conversion. See *Loker v. State, supra; State v. Tracey, supra.* As this proposition of law provided one of the principal cornerstones of appellant's defense to the embezzlement count, we cannot find that the court's failure so to instruct was harmless, even though, as we have heretofore indicated, there was sufficient evidence adduced at the trial from which the jury could have concluded that the Scholls had the requisite legal interest in the misappropriated monies

---

5. A requested instruction which we think was properly denied by the court.

when they were converted. The fact that the jury was not required to consider the existence of this element of the offense, but was instructed that guilt could be predicated on a finding that the embezzled funds belonged "to someone other than the accused" (and not necessarily the Scholls, as charged in the indictment), was, we think, clearly prejudicial to appellant's defense and requires reversal of the judgment and a remand of the case for a new trial. In so concluding, we have considered the court's instructions to the jury in their total context, but cannot conclude therefrom that, as a whole, they fairly and correctly stated the law as to the embezzlement count.

*Judgment reversed; case remanded for a new trial; County Council for Montgomery County to pay costs.*