WILSON THEODORE PETERSON, DANIEL
HARVEY DEAL, AND PAUL EDWARD
HUNT *v.* STATE OF MARYLAND

[No. 508, September Term, 1971.]

*Decided June 29, 1972.*

480

The cause was argued before MURPHY, C. J., and MOY-LAN and CARTER, JJ.

*Russell W. Shipley* for appellant Wilson Theodore Peterson. *Leo William Dunn, Jr.,* for appellant Daniel Harvey Deal. *R. Moss Carrico, Jr.,* with whom were *Carlton M. Green* and *Babcock, Shook & Green* on the brief, for appellant Paul Edward Hunt.

*Gilbert Rosenthal, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Arthur A. Marshall, Jr., State's Attorney for Prince George's*

*County,* and *Edward G. Neal, Assistant State's Attorney for Prince George's County,* on the brief, for appellee.

MOYLAN, J., delivered the opinion of the Court.

A large number of complaints regarding narcotics violations in the 5700 block of Sheriff Road in the Fairmont Heights section of Prince George's County led the Narcotics Section of the Vice Control Unit of that county's police department to conduct on Thursday, April 6, 1971, a discreet, ten-hour surveillance of the parking lot adjacent to Jack's Liquors at 5701 Sheriff Road. As a direct result of that surveillance, six individuals were arrested on the parking lot at approximately 3:30 that afternoon and the two automobiles in which those six individuals had been sitting were searched.

All six individuals were charged in two counts of a single indictment, alleging respectively (1) the possession of heroin with an intent to sell and (2) the possession of heroin. The two owners of the automobiles were additionally charged under a third count with maintaining the automobiles as common nuisances. Charges against one of the six defendants, Joseph Henry Williams, were stetted. A second of the six defendants, Shandy Junior Richardson, was permitted to enter a plea of guilty to the charge of simple possession.

The other four defendants were jointly tried in the Circuit Court for Prince George's County and were all convicted of possession with intent to sell. The appellants Wilson Theodore Peterson and Daniel Harvey Deal along with Artemus Logan, who has not appealed,[1] were tried by Judge Robert B. Mathias, sitting without a jury. The appellant Paul Edward Hunt was tried simultaneously by a jury, with Judge Mathias, of course, presiding. The three appellants, Peterson, Deal and Hunt, have filed separate briefs and their contentions vary to some extent. Because of the large overlap in their positions, how-

---

1. Logan was ruled to have absented himself voluntarily from the last stage of the trial, after the State had rested its case. He was convicted *in absentia,* but has not been sentenced.

ever, they will be considered together in this single opinion.

A common contention of all three appellants, and the most significant of the seven raised, is that the searches and the subsequent seizures of the contraband heroin were unconstitutional. The probable cause which served as the predicate for the six warrantless arrests and which also served, under one of two alternate theories, as the predicate for the warrantless search of one of the two automobiles accumulated in the mind of the police-surveillant, Detective 1st Class Elmer L. Snow. Since the adequacy *vel non* of that probable cause will be measured from that vantage point, a word is in order about the professional experience and expertise which Detective Snow was able to bring to bear upon the otherwise raw data of visual observation.

Detective Snow had been a member of the Prince George's County Police Department for approximately six and one-half years. He had been assigned to the Vice Squad, working primarily in the Narcotics Section thereof, for approximately three years. His duties included the active investigation of narcotics complaints, the supervising of undercover police officers, and the playing of undercover roles himself. At the time of trial, he was Acting Commander of the Narcotics Section. He testified that while at the Police Academy in 1965, he received approximately 24 hours of classroom training in the identification of drugs and drug abusers. While at the Academy, he worked undercover on a narcotics investigation. He attended the training school conducted by the Bureau of Narcotics and Dangerous Drugs of the United States Department of Justice, and was graduated at the top of his class. At the time of this investigation, he had investigated "well over 100 narcotics complaints." He had testified in "at least 75 cases." He testified that he had seen the type of aluminum foil packet involved in this case on "probably several hundred occasions." We gauge the significance of the visual observations in the case at bar from the standpoint of those trained eyes.

*Taylor v. State*, 9 Md. App. 402, 407; *Johnson v. State*, 8 Md. App. 187, 191-192.

In order to observe possible violations of the narcotics laws, Detective Snow, along with Detective Flaherty (both in civilian clothing), established a clandestine observation post in the bathroom of Jack's Liquors. It was apparently closed off to the public. Peering through venetian blinds, they could observe and photograph any activity on the adjacent parking lot, immediately below them. They were at a second-story level. They entered their observation post at 5:30 a.m. Detective Snow explained that he wanted them to arrive on station before anyone would be on the street to see them for fear that they, white men, might arouse suspicions in a predominantly Negro neighborhood.

The first pertinent observation was at 9:30 a.m. The appellant Peterson drove up in a 1964 white Pontiac. Peterson backed the Pontiac up against the building, immediately below the surveillants. They were in a position to see the top and the left (driver's) side of the Pontiac. At that time, Peterson was alone in the car.

Between 9:30 a.m. and 11:00 a.m., when Peterson was alone in the Pontiac, approximately eleven persons were observed to approach the car. They were all photographed. The first, one Stanley Ernest Henson, approached the driver's side of the automobile and conversed briefly with Peterson. Detective Snow testified that Henson was known to him as a heroin addict. On a second occasion, an unknown female approached the operator's side of the Pontiac, handed United States currency to Peterson, and received in return an aluminum foil packet. On another occasion, the appellant Deal was observed standing beside the car conversing with Peterson. At a later time, two additional persons approached Peterson. One handed him a jacket, which Peterson tried on. Peterson placed the jacket in the Pontiac and delivered an aluminum foil packet in return. On yet another occasion, two other persons approached the car and exchanged money for an aluminum foil packet. Shortly

before 11:00 a.m., four persons drove up in a vehicle, alighted, and approached Peterson. There again was an exchange of money for an aluminum foil packet, and the four persons ran back to the vehicle in which they had arrived and departed. At approximately 11:00 a.m., Peterson drove the Pontiac away from the parking lot.

Peterson and the Pontiac returned at 11:15 a.m. and parked in the same place. At that point, Deal got into the car, sitting in the right front seat, where he remained for the rest of the period of observation. The transactions from the Pontiac continued unabated. Throughout the day, Detective Snow observed approximately fifteen persons approach Peterson on the driver's side of the automobile and exchange currency for aluminum foil packets. He further testified that between six and eight persons approached the passenger side of the automobile and engaged in similar exchanges with Deal. The observation of the passenger side of the Pontiac being slightly more obscured, Detective Snow could testify only to seeing the apparent purchasers count out currency and extend it to the interior of the automobile. He could then observe them withdraw their hands, place them inside their pockets, and walk away from the vehicle. At one point, apparently at approximately 2:00 p.m., while an unknown female was exchanging currency for an aluminum foil packet on the passenger side of the automobile, the co-defendant Logan (who reappears later that afternoon as the driver of the second automobile) was standing there at the passenger side, where he remained for approximately five minutes.

At approximately 1:00 p.m. that afternoon, the appellant Hunt and the co-defendant Williams got in the back seat of the car. They remained in the automobile from then until the arrests at 3:30 p.m., except that Hunt was absent for one approximately thirty-minute period between 2:00 p.m. and 2:30 p.m. While Hunt was in the Pontiac, somewhere between four and seven similar exchanges were transacted with both Peterson and Deal. At one point, Detective Snow observed the appellant Hunt, in the back seat, inserting a needle into his arm.

Detective Snow testified that, on the basis of his professional expertise, he believed the aluminum foil packets to contain heroin and he believed the transactions he had observed to be sales of heroin. At approximately 3:30 p.m., he put through a telephone call to Detective Gerald Howard notifying him to move in with his squad for purposes of making arrests. Shortly after that call was placed, Detective Snow observed a red and white Oldsmobile driven by the previously observed co-defendant Logan pull up and park beside the Peterson Pontiac, approximately two feet away from it. He observed Logan get out of his vehicle, walk over to the passenger side of the Pontiac occupied by Deal, and return to his own vehicle a few minutes thereafter. A supplemental dispatch alerted Detective Howard and his men to move in on the second vehicle as well. That second vehicle was also occupied by the co-defendant Richardson.

While the arrests and searches were being executed, Detectives Snow and Flaherty remained in hiding. It was their hope that if the existence of their hidden observation post were not compromised, it could be resorted to by them for future surveillances.

As the arresting party approached the two vehicles, Detective Richard Beavers observed Logan pushing a black purse through the left front window vent of the Oldsmobile. It dropped to the ground. A few minutes later, Detective Beavers recovered it from its resting place on the pavement. As abandoned property lying out in a constitutionally "non-protected area," its seizure gives us no further concern. It was clearly constitutional. *Hester v. United States,* 265 U. S. 57; *Brown v. Maryland,* 15 Md. App. 584. The purse was divided into two compartments. One of them contained six aluminum foil packets containing approximately "half a spoon" each of heroin. The other compartment contained 85 aluminum foil packets, which were characterized as "decks" of heroin. The "half spoon" size is recognized in the narcotics traffic as a quantitatively larger standard consumer unit than the "deck."

As the arresting party approached the Pontiac, a flurry of activity was noticed. Deal was observed to turn to his left and engage in some sort of manipulative activity below the windshield level. Peterson was observed to be reaching downward. All four occupants of the Pontiac were ordered out of the car. They placed their hands up against the car and were searched. Contemporaneously, Detective Beavers looked into the Pontiac and picked up from the floor, immediately in front of the driver's seat, a black purse similar in appearance to the one jettisoned from the Logan automobile. It also contained two compartments. As in the case of the Logan purse, one compartment contained "half spoon"-sized aluminum foil packets of heroin, and the other compartment contained 54 "decks" of heroin. It was this seizure that all three appellants claim was unconstitutional.

Significantly, none of them argues that Detective Snow (1) lacked probable cause to believe that each of them in his presence had been and still was committing the misdemeanor of possessing heroin; (2) lacked probable cause to believe that each of them in his presence had been and still was committing the felony of possessing heroin with intent to sell; or (3) lacked probable cause to believe that the white 1964 Pontiac they were occupying contained contraband heroin. Any such argument would have been utterly without foundation. From his trained viewpoint, there was no other reasonable explanation for the presence of the automobile upon that parking lot under those circumstances throughout the entirety of that day than as a mobile distribution point for the sale of narcotic drugs. There was no other reasonable explanation for the aluminum foil packets than that they were "decks" and "half spoons" of heroin exchanged generally for currency and occasionally for articles of clothing. There was no other reasonable explanation for the needle in Hunt's arm, under those circumstances, than the injection of a narcotic drug. Snow clearly possessed an amplitude of probable cause focusing upon the Pontiac and all of its occupants.

The appellants place rather an ill-advised reliance upon *Whitely v. Warden of Wyoming Penitentiary,* 401 U. S. 560 (1971). In *Whiteley,* as in the case at bar, an electronically transmitted message signalled the officers to move in for the arrests. There it was a radio bulletin. Here it was a telephone call from Detective Snow to Detective Howard. Beyond that common use of modern communications technology, however, the analogy is totally inapt. *Whiteley* stands for the broad principle that a police officer, with proper justification for an arrest or a search (with or without a warrant), may multiply his available arms and legs to execute his purpose by calling upon other policemen to aid him. By modern electronics, he may call upon those beyond the sound of his voice as well as upon those within his hearing. He does not have to impart to each of his executing agents the building blocks of probable cause that mounted up to his justification. The immediate holding of *Whiteley* was that, just as a justification for police action is not diminished in transmission, neither is it enhanced. If the justification is adequate at the point where the message is transmitted, it is no less so at the point where the message is received. Conversely, if the justification is inadequate at the point where the message is transmitted, that inadequacy endures and will not somehow be dissipated on the wires or on the airwaves. In transmission nothing is lost and nothing is gained. *Whiteley* held, at 568:

> "We do not, of course, question that the Laramie police were entitled to act on the strength of the radio bulletin. Certainly police officers called upon to aid other officers in executing arrest warrants are entitled to assume that the officers requesting aid offered the magistrate the information requisite to support an independent judicial assessment of probable cause. Where, however, the contrary turns out to be true, an otherwise illegal arrest cannot be insulated from challenge by the decision of the

instigating officer to rely on fellow officers to make the arrest."

The instigating officers for the radio bulletin in *Whiteley* relied upon a signed arrest warrant which was inadequate on its face. The mere broadcast of its existence could not cure or obscure its fatal defect. The instigating officer for the telephone message in the case at bar relied upon the probable cause in his own mind. There was neither defect nor inadequacy therein. In each case, when the directive to execute an arrest or a search is traced back to its point of first transmittal, the justification at that point of origin must be analyzed and found to be sound. In *Whiteley*, it was not sound; in this case, it was.

Beyond that ill-placed reliance upon *Whiteley*, the appellants attempt to classify Detective Snow as just another confidential informant and to invoke the "basis of knowledge" requirement of *Aguilar v. Texas*, 378 U. S. 108 (1964), for his telephoned information, thereby branding it as "conclusory." The reasoning is far-fetched and ignores the clearly articulated decisions of the Court of Appeals and of this Court that probable cause will be measured in terms of the collective information within the possession of the entire police team. The Court of Appeals in *Farrow v. State*, 233 Md. 526, in dealing with a bi-county police relationship far more attenuated than the one at bar, held, at 531-532:

"When Sergeant Rawlings, after interviewing defendant's wife, thereafter broadcast the description of the defendant and his automobile and advised that he was wanted by the Baltimore City police for rape and other crimes, we think it is clear that he had probable cause to do so. The officers in Anne Arundel County who made the arrest knew nothing about the probable cause but they had received a 'look out' for the defendant from a responsible source and we think that is sufficient. If the police team working on the particular case had accumulated suf-

ficient information to furnish probable cause for a reasonable man to believe that the alleged crime had been committed and that there was probable cause to believe that the defendant was involved therein, there was sufficient cause for his arrest."

See also *Bolesta v. State,* 9 Md. App. 408, 415; and *Hebron v. State,* 13 Md. App. 134, 146-147 (and cases cited therein). In the case at bar, Detective Snow was a part of the "police team." His knowledge was attributable to the whole team.

With the probable cause of one therefore inuring to all, the search for and the seizure of the black purse from the white Pontiac is constitutionally sound upon either of two independent rationales.

Detective Beavers' search of the automobile was a legitimate incident of the lawful arrests of its occupants. *Chimel v. California,* 395 U. S. 752 (1969), makes clear that a "search incident" extends not simply to the person of the arrestee but also to the surrounding area within "his immediate control"—the fair "extension of his person"—the area within his reasonable grasp or reach within which he might grab or lunge for a weapon or within which he might be able to destroy evidence. Where four arrestees are ordered from a vehicle and are braced against it for a search, where two others are being arrested several feet away, and where the doors of the vehicle are still open, the contemporaneous survey by Detective Beavers of the interior of that automobile is, we hold, within the legitimate search perimeter of these particular lawful arrests. This is particularly so with evidence as readily destructible as heroin. The search here followed the arrests instantaneously and was of the very spot where Peterson was sitting at the moment of his arrest and was within several feet of where he was standing at the moment of the search. The seizure here was the product of a legitimate "search incident."

The appellants advance a further argument that since

the police had the time and opportunity to obtain a search warrant and arrest warrants, the warrantless arrests and warrantless searches were constitutionally prohibited. The constitutional principle they assert is simply inapplicable to arrest and to "search incident" situations. The most libertarian decision ever to interpret the Fourth Amendment, *Trupiano v. United States*, 334 U. S. 699 (1948), disavowed the extreme approach which the appellants here espouse as to warrantless arrests. The Supreme Court there said, at 705:

> "The absence of a warrant of arrest, even though there was sufficient time to obtain one, does not destroy the validity of an arrest under these circumstances. Warrants of arrest are designed to meet the dangers of unlimited and unreasonable arrests of persons who are not at the moment committing any crime. Those dangers, obviously, are not present where a felony plainly occurs before the eyes of an officer of the law at a place where he is lawfully present. Common sense then dictates that an arrest in that situation is valid despite the failure to obtain a warrant of arrest."

The arrests here are, therefore, valid, notwithstanding an arguable opportunity to obtain arrest warrants. *Trupiano* did, to be sure, condemn a "search incident" to an arrest where there had been prior opportunity to obtain a search warrant and where the evidence uncovered in such "search incident" was not inadvertent. *Trupiano*, however, was overruled by *United States v. Rabinowitz*, 339 U. S. 56 (1950). Although a part of *Trupiano's* rationale, not here pertinent, was reinstated by *Chimel*, *Coolidge v. New Hampshire*, 403 U. S. 443 (1971), makes clear that this "inadvertence" or "search-warrant-when-feasible" requirement was not reinstated with respect to a "search incident to lawful arrest" and that no such requirement exists. *Coolidge*, at 482. We, by no means, accept the factual conclusion advanced by

the appellants here that there was a feasible opportunity to obtain a search warrant or arrest warrants, but the point is moot in view of the nonexistence of such a constitutional requirement, in any event.

Completely independent of the "search incident" rationale, the search of the Pontiac here was constitutional, we hold, under the so-called "automobile exception" to the warrant requirement. *Carroll v. United States,* 267 U. S. 132 (1925). The first of the two necessary preconditions—the existence of probable cause to believe that the automobile contained contraband or other evidence of crime—has already been broadly discussed hereinbefore. We hold that the second necessary precondition—the existence of exigent circumstances—was also present. The automobile was upon a parking lot open to the public. Four persons were arrested from that automobile immediately prior to its search. It was mobile. Even with its occupants moving into custody, it was vulnerable in its position to confederates in the well-organized underworld of the narcotics traffic. Its suspected contents were readily destructible. In that bustling marketplace of narcotics users, it was further an inviting target for theft by any tempted or opportunistic "junkie." The exigency in the situation at bar was at least as strong as that in *Carroll, supra;* in *Husty v. United States,* 282 U. S. 694 (1931) ; and in *Brinegar v. United States,* 338 U. S. 160 (1949), and was much stronger than that in *Scher v. United States,* 305 U. S. 251 (1938), and in *Chambers v. Maroney,* 399 U. S. 42 (1970), none of which cases has been disavowed by *Coolidge.* See pp. 458-464. *Coolidge,* the only Supreme Court decision ever to disallow the warrantless search of an automobile on the basis of non-exigency,[2] is simply factually inapposite to the case at

2. In the other two Supreme Court decisions overturning automobile searches, *Preston v. United States,* 376 U. S. 364 (1964), and *Dyke v. Taylor Implement Manufacturing Co.,* 391 U. S. 216 (1968), probable cause was held to be lacking, and the existence of exigency *vel non* was not considered. Those decisions went off on the question of whether the automobile searches could be deemed incidents of arrest. Being removed both in space and in time from the arrests, it was held that they could not.

bar. Not only had the police in *Coolidge* had probable cause to obtain a search warrant for the automobile for several weeks prior to its search, but it was immobilized upon a private driveway, its owner was in custody, his wife and family were in quasi-custody, inaccessible to the automobile, and the automobile was under police guard in a quiet haven strikingly unlike the parking lot at bar.

*Coolidge* makes clear that, just as in the case of a "search incident," the "inadvertence" or "search-warrant-when-feasible" requirement of *Trupiano* has not been reinstated with respect to the "automobile exception." See p. 482. A prior opportunity to obtain a warrant is, to be sure, a factor, but only one of the factors to be considered with all of the other circumstances prevailing at the time the search is actually made.

Even as to the existence of that single factor, we are, by no means, persuaded that it was feasible in the case at bar to obtain a search warrant for the Pontiac. Detective Snow was in a tactically difficult field situation. His probable cause was slowly, if surely, accumulating over the course of the day's observations. He could not be certain when he had enough and could safely curtail the accumulation. New parties were entering into the illicit picture. Departures from the crime scene could be sudden. His had to be the tactical judgment of when to spring the trap, a decision wherein dispatch was of the essence and where delay might well have imperiled the success of the mission. The situation at bar does not remotely resemble that in *Coolidge*.

Nor may the appellants take their argued solace in our decision in *Scales v. State,* 13 Md. App. 474. In describing there in full detail all of the factors which contributed to the finding of exigency in that particular case, we, by no means, exhausted the category or intended to establish that peculiar combination of factors or any one of them as a *sine qua non* for measuring other possible exigencies. Exigency is of infinite variety. The

circumstances at bar were exigent; indeed, they were stronger than those prevailing in *Scales*. The warrantless search of the automobile was valid.

There was, therefore, for either reason, no Fourth Amendment impediment to the convictions in this case.

\* \* \*

With mild variations, all three appellants contest the sufficiency of the evidence (1) to sustain the verdict in the case of Peterson and Deal and (2) to permit the case to go to the jury in the case of Hunt.

They all question the proof of the element of "intent to distribute." With respect to Peterson and Deal, who were tried by the court, Judge Mathias indicated that he was not considering against them the contents of the purse abandoned by Logan. With respect to Hunt, Judge Mathias instructed the jury similarly to disregard the recovery from the Logan purse. Even thus restricting the evidence to be considered to that taken from the Pontiac, the proof was overwhelming. At least one "half spoon" of heroin and 54 "decks" of heroin were all neatly packaged for the retail market. This massive quantity remained even at the end of a long and busy day of merchandising apparent packets of heroin. In the case at bar, moreover, this more than ample evidence for the average case turns out to be mere surplusage. No indirect or circumstantial inference as to intent has to be drawn in the face of the direct and damning observations. The distributions themselves established in absolute terms the intent to distribute.

As to Peterson's criminal agency, he was observed, red-handed, in approximately fifteen acts of sale. As to Deal's criminal agency, there was a mild difference in degree but no difference whatsoever in kind. He also was observed, red-handed, in six to eight acts of sale. The evidence showing directly facts from which the trial judge could fairly be convinced, beyond a reasonable doubt, of the guilt of both Peterson and Deal, we hold that he was not clearly erroneous in reaching those verdicts. *Williams*

*v. State,* 5 Md. App. 450, 459; *Metz v. State,* 9 Md. App. 15, 23; Maryland Rule 1086.

The reasoning is only slightly more indirect with respect to Hunt. He was one of four persons present inside a busy narcotics distribution point for a full two hours over a two and one-half hour period. A number of sales were consummated while he was in the car. His own use of a needle for the clearly inferable purpose of injecting heroin belied any theory of naivete on his part as to what was blatantly going on about him. The joint possession cases are all analyzed in *Folk v. State,* 11 Md. App. 508, and Hunt clearly falls upon the side of the line where guilty knowledge and joint participation will be attributed. We said in *Folk,* at 518:

> "The common thread running through all of these cases affirming joint possession is 1) proximity between the defendant and the contraband, 2) the fact that the contraband was within the view or otherwise within the knowledge of the defendant, 3) ownership or some possessory right in the premises or the automobile in which the contraband is found, or 4) the presence of circumstances from which a reasonable inference could be drawn that the defendant was participating with others in the mutual use and enjoyment of the contraband."

Whether he was a full partner as a principal in the first degree or a mere principal in the second degree, ready to aid and abet in whatever manner should become necessary, is immaterial. The admissible evidence adduced at the trial either showed directly, or circumstantially, or supported a rational inference of facts from which the jury could fairly be convinced, beyond a reasonable doubt, of Hunt's guilt of the offense charged. The trial judge, therefore, properly denied the appellant's motion for a judgment of acquittal and properly submitted the case to the jury. *Williams v. State, supra; Metz v. State, supra.*

\* \* \*

The question of trial severance is raised by both Peterson and Hunt. Peterson contends that it was error for him to be required to stand trial both with Deal and with Logan. Hunt contends that it was error for him to be required to stand trial with Logan. Underlying all considerations of the proper exercise of judicial discretion under Maryland Rule 735 as to whether to order separate trials is the fundamental concern of whether "it appears that an accused or the State will be prejudiced by a joinder of offenses or of defendants . . . for trial together . . ."

As to Peterson vis-a-vis Logan, the short answer is that Judge Mathias explicitly declared that he would not consider against Peterson any of the evidence abandoned by Logan. In terms, therefore, of possible prejudice, this is dispositive. *State v. Hutchinson,* 260 Md. 227.

As to Peterson vis-a-vis Deal, the complaint is that the additional charge of maintaining the automobile as a common nuisance lodged against Deal somehow managed to prejudice Peterson. Although ownership of the automobile may have rendered Deal liable to an additional charge, the evidence against Deal and Peterson all related to "the same act or transaction," which would permit them to be charged, as they were, under the same indictment under Maryland Rule 716 b. No evidence came in on the common nuisance question apart from that which came in and bore directly upon the possession counts themselves. Peterson was the omnipresent common denominator directly implicated by every visual observation testified to and by every shred of evidence adduced. The evil sought to be guarded against by such cases as *Lewis v. State,* 235 Md. 588, is the consideration against an accused of extraneous matters not attributable to him. As to Peterson in the case at bar, nothing was extraneous. His theory of prejudice is simply unfathomable.

As to Hunt vis-a-vis Logan, the trial judge instructed the jury to disregard any reference to any evidence that came from the Logan automobile. In so doing, he may

well have given Hunt more than that to which Hunt was entitled. The decision as to whether to grant a severance lies within the sound discretion of the trial judge under Maryland Rule 735, and one of the factors to be considered is the saving of time and expense which unnecessary separate trials would entail. *Jennings v. State*, 8 Md. App. 312. The Assistant State's Attorney proffered and the evidence bore out such a strong probability of a common criminal effort by all defendants, including Logan, that the evidence admissible as to one would have been admissible as to all.

The Logan vehicle admittedly arrived late in the period of observation. However, Logan himself had earlier been observed in conversation with the occupants of the Pontiac. That conversation was during the consummation of an illicit sale of heroin. After the Logan Oldsmobile pulled into place parallel to and approximately two feet from the Pontiac, Logan got out and again engaged in conversation with the occupants of the Pontiac, one of whom was Hunt.

Hunt urges upon us that Logan's presence and Logan's perpetration of a similar crime were mere coincidence. We cannot say that the trial judge was wrong in finding otherwise. The Pontiac and the Oldsmobile may have been separate stalls, but they were immediately adjacent stalls in the same floating market, dispensing similar items in similar packages in similar sizes out of similar containers to the same clientele via the same presumed prearrangement as to where the operation would be going on on that particular day and employing the same *modus operandi*. The operating personnel of both vehicles were in close and familiar contact with each other, and neither group apparently feared compromise by the other or apparently resented competition from the other. The most remote connection that can reasonably be hypothesized to separate the two vehicles and their respective sets of occupants is that the night shift was about to replace the day shift when the police moved in. We hold that Judge Mathias did not abuse his dis-

cretion in concluding that this was a joint operation and in refusing to sever the trials.

Moreover, any evidence which the jury might have considered, notwithstanding a clear instruction not to do so, against Hunt coming from Logan was so merely cumulative to the mass of evidence already inculpating him that we would be convinced beyond a reasonable doubt that the error was harmless under *Chapman v. California*, 386 U. S. 18 (1967), even if we deemed there to be error, which we do not.

The above rationale for the Hunt-Logan joinder for trial could apply with equal validity to the Peterson-Logan joinder for trial, had that question not already been effectively disposed of on other grounds.

\* \* \*

The remaining four contentions are those of Hunt alone.

He first complains that the trial judge committed prejudicial error in denying his motion for a mistrial after Detective Snow identified one Stanley Ernest Henson as "a person known to me to be a heroin addict." Henson had been the first person observed to approach the white Pontiac shortly after it was parked at 9:30 a.m. Peterson was the only person in the car at that time. The recitation by Detective Snow of a significant characteristic known to him was clearly relevant and admissible on the limited issue of probable cause. Even if improperly considered on the merits, its impact, we are convinced, was minimally cumulative on the ultimate issue of guilt or innocence. Hunt, of course, was not present in the Pontiac when Henson approached it. The long procession of purchasers subsequently approaching that automobile and obtaining aluminum foil packets, characterized by Detective Snow as typically those used in the narcotics trade, clearly established the nature of the transactions, in any event. Moreover, the recovery of the large supply of well-packaged heroin at the time of the ultimate search removed beyond any peradventure of a doubt any lin-

gering question as to what was going on on that parking lot throughout the course of the day. We are convinced, beyond a reasonable doubt, that the error, if any, was harmless. *Chapman v. California, supra.* The decision of whether to grant a mistrial rests within the sound discretion of the trial judge. *Britton v. State,* 10 Md. App. 70. We hold that Judge Mathias did not abuse his discretion in declining to abort a complex and time-consuming trial for so light and transient a cause.

\* \* \*

At the conclusion of Judge Mathias' instructions to the jury, Hunt indicated that he had no exceptions but did, in exceedingly vague terms, request an additional instruction:

> "MR. CARRICO: I have no exceptions from the instructions given, but I would like the Court to instruct in the Coleman case, which you read previously." (Presumably referring to *Coleman v. State,* 4 Md. App. 386.)

The court declined to give such an instruction upon the basis that the factual predicate in *Coleman* was completely unanalogous to the one at bar. Hunt never made clear precisely what part of the five-page opinion in *Coleman* he wished read to the jury. Judge Mathias did help clarify his position for him:

> "THE COURT: You are asking for that instruction, mere presence is no indication of guilt of an offense; is that what you are asking?
> "MR. CARRICO: Yes, sir.
> "THE COURT: You have your exception. I will not give that because it is not applicable in this case, because in this case this defendant spent hours in this operation here. You don't know what was going on, I don't know what was going on, and no evidence presented in this case to make that an appropriate instruction . . ."

It is, of course, true that it is incumbent upon the court,

when requested in a criminal trial, to give an advisory instruction on every essential question or point of law supported by the evidence. *Mason v. State,* 12 Md. App. 655, 661; *Gaskins v. State,* 7 Md. App. 99, 105; *Halcomb v. State,* 6 Md. App. 32; *Gordon v. State,* 5 Md. App. 291; *Malloy v. State,* 4 Md. App. 420; *Huber v. State,* 2 Md. App. 245; *Tipton v. State,* 1 Md. App. 556; Maryland Rule 756b. For present purposes, however, the emphasis is upon the qualifying participial phrase "supported by the evidence." In *Coleman,* unlike the case at bar, Coleman was simply standing in the area when two companions suddenly and spontaneously began to assault a woman. In the case at bar, unlike *Coleman,* Hunt had been present inside the nerve center of the narcotics distribution station for the better part of the preceding two and one-half hours. He had, furthermore, been observed injecting narcotic drugs himself. The factual predicate of "mere presence, standing alone," was not established so as to require the requested instruction.

\* \* \*

Penultimately, Hunt complains that the jury returned improper verdicts, contrary to the instructions of the judge. In sending the jury out, Judge Mathias outlined for them three possible verdicts: (1) guilty of count one and not guilty of count two; (2) not guilty of count one and guilty of count two; and (3) not guilty of either count. Although there was no discussion from the court or from counsel on the available variations of verdict, the court presumably acted upon the assumption that the second count of mere possession would merge into the first and greater count of possession with intent to distribute. Notwithstanding the instruction, the jury returned a verdict of guilty as to both counts. The following transpired at the bench:

"MR. CARRICO: The verdict is improper. He can't be guilty of both.
"THE COURT: He can't?
"MR. CARRICO: No, sir.
"THE COURT: Very well, we can handle that.

But there is no question but what their verdict is to each count, is there?

"MR. CARRICO: No, sir.

"THE COURT: My question is do you want to poll the jury as to whether or not it is their verdict?

"MR. CARRICO: Yes, sir; I do want to do that. No; I will withdraw that.

"THE COURT: You do or you don't?

"MR. CARRICO: I don't.

"THE COURT: There is no question as to their verdict. Very well."

Whereupon the verdict of the jury was recorded and the jury was excused. It was only then, after the jury had left the courtroom, that Hunt moved for a mistrial. It was denied. Hunt moved to strike the verdict under the first count. It was denied. Hunt moved to strike the verdict under the second count. It was granted.

In *McDuffie v. State*, 12 Md. App. 264, we dealt with a jury verdict involving findings of guilty as to lesser-included merging counts and also as to inconsistent counts. The trial judge there made appropriate corrections. In holding his actions to be nonreversible, we said, at 267:

"It is clear that in the case now before us, the better procedure would have been for the trial judge to have asked the jury to return to the jury room and, if they were indeed intent upon returning a verdict of guilty under the first count charging robbery with a dangerous and deadly weapon, then to return verdicts of not guilty on the other counts—because of merger with respect to counts 3, 4, 6, and 7 and because of inconsistency with respect to counts 2 and 5. A common-sense review of what transpired, however, permits of no other conclusion than that the jury found the appellant guilty under the most major count—robbery with a dangerous and deadly weapon—and then, subsidiarily

> but erroneously, concluded that all of the other counts were lesser-included constituent parts of the major count and that a finding of guilt thereon was logically compelled."

The same common-sense conclusion as to what transpired persuades us here.

To rule that here, upon motion made after the jury was discharged, a mistrial was compelled would be to exalt form over substance. Whatever the hypertechnicalities, essential justice was done. Upon the theory of merger, the trial judge granted Hunt's motion to strike the verdict as to the second count. Sentence was passed only as to the first count. We hold that this was proper and that Hunt suffered no prejudice.

\* \* \*

Finally, Hunt complains that he was prejudiced by the testimony of Detective Snow as to incidents which transpired before Hunt came upon the scene. He urges that the only testimony admissible as to him is that relating to specific incidents in which he was immediately present.

In advancing this argument, Hunt misperceives the root purpose of the adjudicative process and unduly narrows its focus. Notwithstanding the few "prophylactic" exceptions of the last decade, the criminal trial, as any trial, is still fundamentally a search for truth. Otherwise admissible clues that assist in the solution of the ultimate riddle of "Who did what?" are relevant. Relevance hinges upon whether questioned data does or does not contribute to the final answer and not upon whether a particular defendant happens to be absent or present when that data is unearthed.

The critical question for the jury was twofold: (1) Was Hunt involved? and (2) If so, in what was he involved? His presence was a vitally important factor to the evidence bearing upon the first question of his involvement. It was, by no means, an indispensable factor to all of the evidence bearing upon the larger background

question of the nature of the thing in which he was involved. If an appreciation of the larger mosaic lends revealing interpretative color to the otherwise ambiguous nature of a constitutent fragment, it is helpful in the search for truth. See *State v. Swales,* 12 Md. App. 69, 85-86.

A consistent pattern of activity emanated from the white Pontiac throughout the five and three-quarter hours of observation. Hunt's presence for two of those typical hours involved him inexorably in the operation. The full five and three-quarter hours of observation were relevant to the companion issue of What was the nature of the thing in which he was involved? Both were relevant issues in determining his guilt. We do not hold that Hunt can be deemed to be a criminal agent in the morning activities. We rather hold that the morning activities help to reveal the ongoing *corpus delicti,* whereof Hunt becomes a criminal agent in the afternoon.

Common sense and the normal processes of human reasoning do not adjourn with the convening of a criminal trial. We perceive no error.

*Judgments affirmed.*