*Kimery Darren Martin v. State of Maryland*, No. 101, Sept. Term 2024. Opinion by Tang, J.

**CRIMINAL LAW – REVIEW – PRESENTATION AND RESERVATION IN LOWER COURT OF GROUNDS OF REVIEW – IN GENERAL – PROCEEDINGS AT TRIAL IN GENERAL**

Under the Fourth Amendment, a defendant must have standing to challenge the search and/or seizure in question to litigate the possible suppression of evidence. Standing refers to the defendant's reasonable expectation of privacy in the premises or the property. Procedurally, the State has the initial burden to raise the challenge to standing. If the State fails to raise a timely challenge and the trial court proceeds to reach the Fourth Amendment merits, the State will be estopped from raising the challenge at a later stage. If the State does raise a timely challenge to the defendant's standing—which may be accomplished by even the most informal of oral pleadings—then the burden of proof is allocated to the defendant to show his standing.

The State did not contend at the suppression hearing that the appellant lacked a legitimate expectation of privacy in identification card and bloodied clothes seized at the hospital while he was being treated for gunshot injury. As the issue was neither raised before, nor decided by, the circuit court, it was not preserved for appellate review. Maryland Rule 8–131(a).

**SEARCH, SEIZURE, AND ARREST – OTHER OFFICERS OR OFFICIAL INFORMATION – COLLECTIVE KNOWLEDGE**

The collective knowledge doctrine holds that when an officer acts on an instruction from another officer in making an investigatory detention, the act is justified if the instructing officer had sufficient information to justify taking such action herself. Likewise, when a group of officers in close communication with one another determines that it is proper to arrest an individual, the knowledge of the group that made the decision may be considered in determining probable cause, not just the knowledge of the individual officer who physically effected the arrest. In other words, the doctrine is limited to officers acting on the information and instructions of other officers.

In denying the motion to suppress, the circuit court erred in denying the motion to suppress on the basis that the collective knowledge of officers with the Prince George's County Police Department (PGPD) and Metropolitan Police Department (MPD) justified the seizure of the appellant's identification card and bloodied clothes. First, the evidence did not support the application of the collective knowledge doctrine. Second, the collective knowledge doctrine did not resolve the argument that the State failed to rebut the presumption that the warrantless seizure was invalid; the MPD officer had some involvement with the possible seizure of the items before the PGPD officer arrived and

ultimately took the items, and the State did not present evidence to explain the antecedent events.

**CRIMINAL LAW – EVIDENCE – COMPETENCY IN GENERAL – WRONGFULLY OBTAINED EVIDENCE – EVIDENCE ON MOTIONS**

The plain view exception permits law enforcement to seize an item if (1) the item is plain view; (2) the officer's initial intrusion is lawful; (3) the incriminating character of the evidence is immediately apparent; and (4) the officer has a lawful right of access to the object itself.

Based on the suppression record, the plain view exception did not support the warrantless seizure of the appellant's identification card and bloodied clothing. As it relates to the identification card, it was handed to the testifying officer and was not in his plain view. As it relates to the clothing, there was evidence to suggest that another officer was involved in the placement of the clothing in the hallway where the testifying officer observed it. There was insufficient evidence to demonstrate that the testifying officer had a lawful right of access to the clothing in light of the other officer's apparent involvement.

**CRIMINAL LAW – EVIDENCE – COMPETENCY IN GENERAL – WRONGFULLY OBTAINED EVIDENCE – EXTENT OF EXCLUSION; "FRUIT OF THE POISONOUS TREE" – EXCEPTIONS – INEVITABLE DISCOVERY**

The warrantless seizure of an object may be permissible if the State can show, by a preponderance of the evidence, that the evidence inevitably would have been discovered through lawful means. The applicability of the inevitable discovery doctrine is a highly fact-based determination and involves review by a trial court whether the evidence in question would have been found.

This Court declined to apply the doctrine to this case because the theory of inevitable discovery was not raised by the State below. In addition, given the factual void presented by the suppression record in the instant case, making that determination would necessarily involve speculation on this Court's part.

Circuit Court for Prince George's County
Case No. C-16-CR-23-001601

REPORTED

IN THE APPELLATE COURT

OF MARYLAND

No. 101

September Term, 2024

_____

KIMERY DARREN MARTIN

v.

STATE OF MARYLAND

_____

Friedman,
Tang,
Wright, Alexander, Jr.
    (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Tang, J.

_____

Filed: November 21, 2025

Pursuant to the Maryland Uniform Electronic Legal
Materials Act (§§ 10-1601 et seq. of the State
Government Article) this document is authentic.



Gregory Hilton, Clerk

After a multi-day jury trial, the Circuit Court for Prince George's County convicted appellant Kimery Darren Martin of attempted voluntary manslaughter, second-degree assault, and related firearms offenses in connection with the shooting of William Mason.

On appeal, the appellant challenges the denial of his motion to suppress the seizure of his identification card and bloodied clothing while being treated for a gunshot injury at the hospital. He also asks this Court to review for plain error the admission of Mr. Mason's deposition testimony at trial.[1]

For the reasons that follow, we shall reverse the circuit court's denial of the motion to suppress and remand the case for a new trial consistent with this opinion. Because we have decided to remand this case for a new trial, we find it unnecessary to address the admission of Mr. Mason's deposition testimony at trial.

## I.

## BACKGROUND

In the afternoon of April 7, 2023, officers from the Prince George's County Police Department ("PGPD") responded to a shooting at a liquor store in Temple Hills, Maryland, just outside the border of the District of Columbia ("D.C."). Officers found Mr. Mason on

---

[1] In his brief, the appellant frames the questions presented as follows:

1. Did the circuit court err in denying Kimery Martin's motion to suppress his physical belongings seized without a warrant while he was in an operating room at George Washington University Hospital?

2. Did the trial court commit plain error in allowing a witness's deposition testimony to be read at the trial when there was no express waiver from Kimery Martin of his constitutional rights to be present at the deposition and confront the witness?

the ground outside the store with gunshot wounds. He was taken to a local hospital for treatment of his injuries. The injuries left Mr. Mason paralyzed from the neck down.

While on scene, PGPD Detective Jonathan Marks reviewed the surveillance video from the liquor store. The footage showed Mr. Mason inside the store at the lottery ticket machine. At some point, a silver Honda Crosstour pulled up outside the store, and a masked man exited the rear of the vehicle. The masked man entered the store and pulled a firearm from his jacket. Mr. Mason then fled the store. When Mr. Mason ran outside, the masked man followed and shot Mr. Mason in the back. Mr. Mason fell to the ground, and the masked man continued to fire at Mr. Mason. An associate of Mr. Mason, who was outside and was also armed, returned fire at the masked man. The associate struck the masked man in the leg and then fled the scene.[2] The Crosstour pulled up, and the masked man got inside. The Crosstour then drove away.

After reviewing the video, police checked with local hospitals for anyone who had been admitted with a gunshot wound. Police received a call from George Washington University Hospital in D.C. that a man had been dropped off with a gunshot wound to his right leg. Detective Marks went there to investigate.

After arriving at the hospital, Detective Marks went to the hospital's security office to review its camera footage to see if the Crosstour dropped off the gunshot patient at the hospital. Detective Marks saw the vehicle on the hospital surveillance video. He confirmed that it appeared to be the exact vehicle as the one at the liquor store shooting. In the video,

---

[2] The police were not able to locate or identify Mr. Mason's associate.

an individual exited the vehicle wearing clothing that matched what the masked man was wearing in the liquor store footage.

By the time Detective Marks arrived, the individual was already in the operating room. Detective Marks met with police from the D.C. Metropolitan Police Department ("MPD") "[r]ight in the hallway right outside" the operating room. An MPD officer provided Detective Marks with a D.C. identification card bearing the appellant's name and address. The MPD officer also told Detective Marks about a bag of clothes and "where they were." Detective Marks confirmed with the MPD officer that the appellant was the one who had walked into the hospital with the gunshot injury.

Detective Marks saw the bag of clothing in the hallway outside the operating room. It was a transparent bag marked "biohazard" with a "lot of blood in the bag," and the clothes were "completely drenched" in blood. The detective saw that the clothes in the bag matched the clothing that the masked man was wearing on the liquor store surveillance video and hospital surveillance video. He did not know who had placed the clothes in the bag or who had placed the bag in the hallway. Based on his conversation with the MPD officer and the fact that the clothing in the bag "matched the clothing description of what [he] saw in both videos," Detective Marks seized the bag of clothes and ultimately logged it into evidence.

PGPD officers were not able to read the tag number on the Crosstour from the videos, but they could see that it was a Maryland temporary tag. They checked all databases in the area to find a silver Crosstour that had been issued a Maryland temporary tag. Based on the investigation, they were able to find one that matched the vehicle in the surveillance videos. After identifying the tag number, officers found that the car had been the subject of

3

several parking tickets. The parking tickets had been issued in the same block as the address listed on the appellant's identification card, which was less than a mile from the liquor store.

On May 30, 2023, a grand jury indicted the appellant for attempted first-degree murder, attempted second-degree murder, first-degree assault, second-degree assault, reckless endangerment, and firearm-related offenses.

## A.

## Motion to Suppress

The appellant filed an omnibus motion that included a motion to suppress "any and all evidence obtained by the State in violation of the defendant's rights as guaranteed by the 4th, 5th, 6th, and 14th Amendments to the Constitution of the United States, and the Maryland Declaration of Rights."[3] The State responded in kind with a boilerplate opposition to the motion, stating, in relevant part, that the appellant could not demonstrate "a reasonable expectation of privacy in the area searched and thus lacks standing to contest the issue."

On October 6, 2023, the court held a hearing on the suppression motion during which Detective Marks testified as the sole witness. Detective Marks testified about the

_____

[3] Although the practice for some defense counsel to file an omnibus motion, "seeking a panoply of relief based on bald, conclusory allegations devoid of any articulated factual or legal underpinning," is not what Maryland Rule 4-252 anticipates and "is not to be encouraged," our appellate courts "have not disturbed the discretion of the trial courts to permit defendants to supplement unsupported allegations in the motion at or before the hearing, at least where the State is not unduly prejudiced by being called upon to respond immediately to allegations of which it had no prior notice." *Denicolis v. State*, 378 Md. 646, 660 (2003).

investigation that led him to George Washington University Hospital and the circumstances that led to his seizure of the appellant's identification card and clothing, as recounted above.

The defense clarified that the basis of the appellant's motion to suppress was the warrantless seizure of the items, which the State did not challenge the appellant's standing to contest. Specifically, defense counsel argued that evidence of the appellant's identification card and clothes should be suppressed because the State did not call anyone to testify about how the items were obtained from the appellant before Detective Marks took them into custody. Counsel suggested that someone other than Detective Marks—i.e., an MPD officer—must have initially seized the items. Defense counsel summarized the argument as follows:

> [T]his seems to be a case of the State just calling the wrong witness. The seizure in this case, as we heard . . . [Detective Marks] arrived at the hospital. He met and spoke to a D.C. police officer. They instructed him that the bag of clothes -- they gave him the identification, and they told him the bag of clothes was in the hallway. That seizure had taken place, and it happened by someone else.
>
> *The State has to justify a warrantless seizure*, and in order to do that they have to give us testimony about why it was made. They have given us testimony about basically after the seizure happened this officer taking custody of it. But what they have not given us any information about at all is the actual seizure in this case, that is the person who took those clothes and bagged them from [the appellant], took that wallet and bagged it.
>
> There is no evidence about that, and for that reason alone the search cannot be found reasonable -- *the seizure rather* cannot be found reasonable and the motion to suppress should be granted.

(emphasis added).

The court proceeded to deny the motion to suppress. It *sua sponte* relied on the collective knowledge of the officers involved to justify the seizure of the items:

5

All right, so there is a shooting. The vehicle that was involved in the shooting drives away. The collective knowledge of the officers, they find out what kind of car as [*sic*] on scene. They get a call, go to the hospital, and review the footage. That car is similar to the car that was leaving the scene. They -- he speaks to someone at the hospital, a D.C. officer that was at the scene, and the clothes from the individual that was -- came into the hospital were placed into the bag and he took the bag.

This isn't a trial. It is probable cause. It is the collective knowledge of all the officers. And while there may be problems or inconsistencies at trial, for today's purposes the [c]ourt finds that there was a reasonable basis for that officer to seize those items.

Defense counsel then asked the court to clarify "which officer" it was referring to, as well as "the basis" for that officer's seizure of the items. The court responded:

It is the collective knowledge. This officer says he spoke to the D.C. officer. The D.C. officer gave him information that these were the clothes of the individual that was brought in. They took those clothes. And the officer also said while he did not put them in property, he was able to observe that they were the same clothes that he saw on the video.

**B.**

**Trial**

A jury trial began on November 28, 2023. Although the identification card and the bloody clothes were not admitted into evidence, Detective Marks testified about how he came to seize these items. Another officer, Detective Braden Dalton, testified to how the police developed a connection between the appellant and the Crosstour by using area databases and checking for parking tickets issued to the Crosstour near the appellant's listed address, as recounted above.

6

Mr. Mason was unable to testify at trial due to his condition, but a redacted transcript of his prior deposition was read to the jury.[4] According to Mr. Mason, he had known the appellant for years. He testified that on the day in question, he was at the liquor store "playing numbers." He was with another person, who he claimed had left the store by the time the appellant arrived. He then heard the appellant call out to him, telling him he was a coward. Then the appellant shot him. As for motive, Mr. Mason asserted that he did not know why the appellant shot him. Defense counsel suggested during cross-examination that the reason was that Mr. Mason had robbed the appellant earlier that day. Mr. Mason denied this, stating instead, "They robbed me."

The appellant testified in his defense. He acknowledged that he shot Mr. Mason but claimed it was in self-defense. He testified that Mr. Mason had robbed him at gunpoint earlier in the day while the appellant was selling cigarettes at a local gas station. The appellant, now armed, then went to the liquor store where Mr. Mason was known to hang out. He testified that he intended to confront Mr. Mason and get his money back and that the gun was only for protection.

The appellant testified that he entered the liquor store and made eye contact with Mr. Mason. The appellant heard Mr. Mason call out to his associate, who he claimed was standing by the door and whom the appellant believed to be armed. He explained that he had to defend himself because he knew that Mr. Mason carried a firearm based on the

---

[4] Due to Mr. Mason's injuries, the State moved to take Mr. Mason's video deposition in the rehabilitation facility where he was being treated. The court granted the motion. Ultimately, the deposition was conducted about two weeks before trial.

robbery earlier that day. He said that he shot Mr. Mason because he was "scared for his life" but did not intend to kill him.

In the end, the jury found the appellant guilty of attempted voluntary manslaughter, second-degree assault, reckless endangerment, carrying a loaded handgun on his person, and use of a firearm in a crime of violence. The court imposed a cumulative sentence of fifteen years' imprisonment.

## II.

## PARTIES' CONTENTIONS

The appellant contends that the circuit court erred in denying his motion to suppress evidence of his identification card bearing his name and address and the bag of bloodied clothing from the hospital. He argues that the warrantless seizure of the items violated his Fourth Amendment rights. He argues that the State failed to establish probable cause for the seizure or that an exception to the warrant requirement permitted the seizure of his belongings. The appellant also argues that the court's reliance on the "collective knowledge" doctrine to justify the seizure of his belongings was misplaced. Finally, he argues that, given the importance of the testimony at trial about the seizure of these items, the error was not harmless and therefore a new trial is warranted.

The State argues that the seizure did not implicate the Fourth Amendment because the appellant did not, and could not, meet his burden of showing that he had a reasonable expectation of privacy in the items that Detective Marks seized in the hospital. Specifically, it contends that the appellant "could not establish a subjective expectation of privacy because he was not present and was in surgery at the time police investigated." In addition,

8

the State argues that D.C.'s and Maryland's mandatory reporting statutes requiring a hospital to report information about shooting victims to police inherently diminish the appellant's privacy interests in a hospital.[5] The State argues that, because the appellant "found his way into a hospital's emergency room after being shot, he forwent any expectation of privacy and so the Fourth Amendment was not implicated" by the seizure of his belongings. The State essentially argues—though it does not explicitly state this in its brief—that the appellant failed to establish standing to challenge the seizure of the items.[6]

Even if the Fourth Amendment did apply, the State argues that the warrantless seizure was proper for other reasons than the one cited by the court. The State agrees that the court's reliance on the collective knowledge doctrine was wrong. However, it contends that this Court can still affirm the denial of the motion based on the doctrines of plain view or inevitable discovery. As for harmless error, the State concedes that it does not apply.

The appellant responds that he retained a possessory interest in his belongings and that his presence in an operating room did not diminish his legitimate privacy interests in his personal effects. The appellant acknowledges the mandatory reporting statutes, but he contends that they do not endorse warrantless seizures of personal effects. Moreover, even if they did, he points out that Maryland's reporting requirement does not apply

---

[5] *See* D.C. Code Ann. §§ 7-2601 to 7-2602; Md. Code Ann., Health-Gen. § 20-703.

[6] We will describe the relationship between standing and reasonable expectation of privacy in Section IV.A below.

extraterritorially to D.C. hospitals, and D.C.'s reporting requirement requires only that D.C. hospitals make a report to the MPD, not Maryland police.

## III.

## STANDARD OF REVIEW

In reviewing the denial of a motion to suppress, "we look only to the record of the suppression hearing and do not consider any evidence adduced at trial." *Daniels v. State*, 172 Md. App. 75, 87 (2006) (citing *Ferris v. State*, 355 Md. 356, 368 (1999)). In doing so, we view the evidence presented at the suppression hearing, along with any reasonable inferences therefrom, in the light most favorable to the prevailing party on the motion. *Davis v. State*, 426 Md. 211, 219 (2012). "We accept the trial court's factual findings unless they are clearly erroneous, but we review *de novo* the court's application of the law to its findings of fact." *Pacheco v. State*, 465 Md. 311, 319 (2019) (citation omitted). In other words, "[w]e conduct our own independent constitutional appraisal of whether the Fourth Amendment has been violated by applying the law to the facts of the matter *sub judice*." *Walker v. State*, 432 Md. 587, 605 (2013) (citation omitted). So long as the suppression record contains sufficient evidence to do so, we have discretion to affirm the suppression court's decision on an alternate basis. *Rush v. State*, 403 Md. 68, 103 (2008) (holding that defendant could not raise an alternate theory of suppression because the record was "not adequate to base a decision" on); *Powell v. State*, 139 Md. App. 582, 589–90 (2001) (appellate court may affirm trial court's ruling on a different ground where the trial court reached the correct result).

# IV.

## OVERVIEW OF SEARCH AND SEIZURE LAW

The Fourth Amendment, made applicable to the States through the Fourteenth Amendment, "guarantees individuals the right to be secure in 'their persons, houses, papers, and effects, against unreasonable searches and seizures.'" *Whiting v. State*, 389 Md. 334, 346 (2005) (citation omitted). "The Fourth Amendment has two parts." *Owens v. State*, 322 Md. 616, 622 (1991). First, it guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." *Id.* Second, it provides that "no Warrants shall issue but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized." *Id.* Thus, "a search or seizure conducted without the benefit of a warrant supported by probable cause is per se unreasonable under the Fourth Amendment, subject only to a few jealously guarded and carefully drawn exceptions." *Id.*

Notably here, the language in the Fourth Amendment "protects two types of expectations, one involving 'searches,' the other 'seizures.'" *United States v. Jacobsen*, 466 U.S. 109, 113 (1984). "A 'search' occurs when an expectation of privacy that society is prepared to consider reasonable is infringed." *Id.* "A 'seizure' of property occurs when there is some meaningful interference with an individual's possessory interests in that property." *Id.*; *accord Texas v. Brown*, 460 U.S. 730, 747 (1983) (Stevens, J., concurring) ("The Amendment protects two different interests of the citizen—the interest in retaining possession of property and the interest in maintaining personal privacy. A seizure threatens the former, a search the latter."); *Soldal v. Cook Cnty., Ill.*, 506 U.S. 56, 68–69 (1992)

11

(explaining that "seizures of property are subject to Fourth Amendment scrutiny even though no search within the meaning of the Amendment has taken place").

"All too frequently lawyers and judges leap headlong into the merits of a Fourth Amendment controversy and do not linger at the threshold to inquire whether the Fourth Amendment is applicable so as even to require satisfaction." Richard P. Gilbert & Charles E. Moylan, Jr., *Maryland Criminal Law: Practice and Procedure* § 25.0, at 279 (1983) ("Gilbert & Moylan"). In assessing "an arguable Fourth Amendment problem," one should ask "two elemental questions: (1) *Is it applicable?* (2) *Has it been satisfied?*" *Id.* at 280. If the answer to the first question is "No, the Fourth Amendment does not apply," then there is no need to analyze the "substance of constitutional satisfaction." *Id.* at 280–81. If, however, the answer is "Yes, the Fourth Amendment does apply," then a constitutional analysis becomes necessary. *Id.*

This appeal invites us to linger at the threshold.

## A.

## Standing Under the Fourth Amendment

Under the Fourth Amendment, a defendant must have standing to challenge the search and/or seizure in question in order to litigate the possible suppression of evidence. *See State v. Savage*, 170 Md. App. 149, 174–75 (2006) ("[O]ne may not litigate an alleged Fourth Amendment grievance unless one is personally aggrieved.").

> The presence or absence of standing . . . has nothing to do with the ultimate Fourth Amendment merits. It is exclusively a threshold question of applicability, concerned only with the coverage by the Fourth Amendment of the defendant who seeks to raise a Fourth Amendment challenge. Far from reaching the Fourth Amendment merits, standing settles only the entitlement

12

to litigate those merits. The adjudication of a standing challenge is but a gatekeeping function.

*Id.* at 174.

"[T]he question of whether an individual has standing under the Fourth Amendment is best analyzed in terms of the individual's substantive rights and requires us first to look at whether the individual invoking the Fourth Amendment possessed a legitimate expectation of privacy in the effects or place searched or seized." *Whiting*, 389 Md. at 347; *see also Alston v. State*, 159 Md. App. 253, 262–63 (2004) (explaining that "standing" refers to the defendant's "reasonable expectation of privacy in the premises or the property"). In *Savage*, Judge Moylan, writing for this Court, explained the relationship between standing and expectation of privacy:

> If, under the totality of the circumstances, one is now deemed to have "a reasonable expectation of privacy," that means that one thereby has a Fourth Amendment right and, for that precise reason, has the standing to litigate an alleged violation of that right. Conversely, if one does not have "a reasonable expectation of privacy," that simply means that one does not have a Fourth Amendment right and, for that reason, has no standing to litigate an alleged violation of a non-existent right. A reasonable expectation of privacy equals a Fourth Amendment right equals standing to vindicate that right. A equals B equals C.

170 Md. App. at 180–81 (citing *Katz v. United States*, 389 U.S. 347 (1967)).

"Procedurally, it is clear that there is an initial burden on the prosecution to raise the challenge to standing. If the State fails to raise a timely challenge and the court goes on to reach the Fourth Amendment merits, the State will be estopped from raising the challenge at a later stage." *Thompson v. State*, 62 Md. App. 190, 202 (1985) (quoting Gilbert & Moylan § 26.1, at 291); *accord Feaster v. State*, 206 Md. App. 202, 215 (2012) ("A failure

of the State to raise a challenge to a defendant's standing at the suppression hearing operates as a waiver of the challenge.").

"Requiring the State to challenge standing in a timely fashion not only recognizes traditional policies of notice and fair play, . . . but also serves to promote the 'avoidance of unnecessary litigation which is a key purpose of the standing requirement.'" *Coomes v. State*, 74 Md. App. 377, 393–94 (1988) (citation omitted). Judge Moylan explains:

> [T]he standing requirement, albeit incidentally beneficial to the State, is not for the benefit of the State. The requirement primarily serves the interest of judicial economy. It is to save busy courts from having to waste time and resources litigating matters that need not be litigated. Once such litigation has taken place because the State was asleep at the switch, however, it is too late for a standing challenge to accomplish the purpose for which it is designed.

*Savage*, 170 Md. App. at 175 n.8 (citing *Steagald v. United States*, 451 U.S. 204, 209 (1981) (explaining that the Government may lose its right to raise factual issues regarding the lack of reasonable expectation of privacy on appeal "when it has made contrary assertions in the courts below, when it has acquiesced in contrary findings by those courts, or when it has failed to raise such questions in a timely fashion during the litigation")). In other words, the purpose of avoiding unnecessary litigation "is completely vitiated when the Fourth Amendment merits have not only been raised but have been completely litigated, prior to standing being raised as an issue." *Coomes*, 74 Md. App. at 394. "When this occurs, the State will necessarily have 'acquiesced in reaching the Fourth Amendment merits . . . and since the very avoidance of unnecessary litigation which is a key purpose of the standing requirement [will not have been] accomplished, the State will not be heard to raise the issue [thereafter].'" *Id.* (citation omitted).

If the prosecution does raise a "timely challenge" to the defendant's standing—which may be accomplished "by even the most informal of oral pleadings"—then "the burden of proof is allocated to the defendant to show his standing. The State has no obligation to show nonstanding." *Thompson*, 62 Md. App. at 202–03 (quoting Gilbert & Moylan § 26.1, at 292).[7] The defendant must establish his or her legitimate expectation of privacy in the place searched or items seized for the Fourth Amendment to apply by: (1) demonstrating an actual, subjective expectation of privacy in the item or place searched; and (2) proving that the expectation is one that society is prepared to recognize as reasonable. *Walker*, 432 Md. at 605 (referring to the *Katz* test). The Supreme Court of Maryland elaborated on these prongs:

> A person demonstrates a subjective expectation of privacy by showing that he or she sought to preserve something as private. An objectively reasonable expectation of privacy, by contrast, has a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society, and constitutes more than a subjective expectation of not being discovered. We have no talisman that determines in all cases those privacy expectations that society is prepared to accept as reasonable. Nonetheless, common experience and social norms bear upon our assessment of whether one has an objectively reasonable expectation of privacy in a particular item or place.

*Raynor v. State*, 440 Md. 71, 83–84 (2014) (internal quotations and citations omitted).

---

[7] When standing to object to a search and/or seizure is not raised preliminarily, what is "timely" will vary from case to case. *Coomes*, 74 Md. App. at 394 (holding that the State timely challenged standing when it raised the issue during argument at the suppression hearing, before the court reached the Fourth Amendment merits and early enough for the defendant, if desired, to respond to the argument and/or present evidence on the point). "[W]hen the issue is raised during argument, the trial judge must be careful to ensure that an accused has the opportunity, if he or she wishes, to meet the argument, either by way of issue or by presenting evidence. This may require the court to offer the opportunity *sua sponte* or, upon request, to postpone the hearing." *Id.* at 395 n.9.

"Whether one's expectation of privacy is legitimate is in 'large measure a function of its reasonableness, and that, in turn, is determined to some extent by the elements of time, place, and circumstance.'" *Joyner v. State*, 87 Md. App. 444, 450–51 (1991) (quoting *McMillian v. State*, 65 Md. App. 21, 31 (1985)). These elements include:

> the [defendant's] possessory interest in the premises; [the defendant's] right to and duration of stay at the searched premises; whether or not he had unlimited access to the searched premises; whether [the defendant] had a right to exclude others from access to the searched area; what precautions he took to maintain his privacy there; [the defendant's] subjective expectation of privacy in the area searched; the location of the property at the time of the search; ownership of the evidence seized, [and] the alleged bailment of the [evidence seized] to a third party[.]

*McMillian*, 65 Md. App. at 32–33 (citations omitted).

We noted that "[o]wnership or legal possession of the seized evidence may be sufficient in some circumstances to entitle a defendant to seek the return of the seized property if the seizure, as opposed to the search, was illegal." *Id.* at 31 n.3 (citing *United States v. Salvucci*, 448 U.S. 83, 91 n.6 (1980), citing *United States v. Lisk*, 522 F.2d 228, 230 (7th Cir. 1975) ("There is a difference between a search and a seizure. A search involves an invasion of privacy; a seizure is a taking of property. The owner of a chattel which has been seized certainly has standing to seek its return.")); *accord Savage*, 170 Md. App. at 181 ("In terms of the objective component of the reasonable expectation of privacy test, one who enjoys *an actual possessory or proprietary interest in* the place searched or *the thing seized* invariably has no problem. An expectation of privacy by such a person is almost as a matter of course deemed to be objectively reasonable." (emphasis added)).

16

**B.**

**Allocation of the Burdens of Proof at a Suppression Hearing**

As the proponent of the motion to suppress, the defendant bears the initial burdens of both production and persuasion. *Epps v. State*, 193 Md. App. 687, 702 (2010). "It [is the defendant], moreover, who [has] then to show that he enjoyed a Fourth Amendment coverage in the first instance and that a search and/or seizure occurred in ostensible violation of that protection." *Id.* (citing *Herbert v. State*, 136 Md. App. 458, 482 (2001)); *see also Bates v. State*, 64 Md. App. 279, 283 (1985) ("The defendant, as the proponent, has, *upon timely challenge*, the burden of establishing standing[.]" (emphasis added)). "At that initial stage of a suppression hearing, it is the State that enjoys the luxury of not having to do anything. It may respond to the defense if it chooses to do so, but it is under no such obligation." *Epps*, 193 Md. App. at 702.

"Once the hearing on such a motion progresses into the merits of the Fourth Amendment, however, there is a possibility that the allocation of the burdens may shift." *Id.* at 703. If the search and/or seizure is pursuant to a judicially issued warrant, "the burdens will remain firmly fixed on the defendant" to show that the search and/or seizure was unreasonable. *Id.* This is because "[w]hen the police execute a search under authority of a facially adequate warrant, it is presumptively good[.]" *Duncan v. State*, 27 Md. App. 302, 304–05 (1975). "Where the evidence is inconclusive in this regard, the State wins." *Id.*

However, once it is established that the search and/or seizure was warrantless, "a tectonic shift occurs in the allocation of the burdens." *Epps*, 193 Md. App. at 703.

17

> When the State's investigation, for whatever reason, follows the disfavored warrantless route, . . . the procedural ball ends up in the State's court. The State assumes the burden of overcoming the presumption of invalidity by demonstrating, by however many steps are necessary, that the warrantless search satisfied one of the firmly established exceptions to the warrant requirement.

*Graham v. State*, 146 Md. App. 327, 349 (2002); *see also Ames v. State*, 231 Md. App. 662, 665 (2017) ("We must never lose sight of our starting point that warrantless searches and seizures . . . are presumptively unreasonable and that the burden is on the State to rebut that presumption and persuade the suppression hearing judge otherwise." (citation omitted)). "Where the evidence is inconclusive" in establishing an exception to the warrant requirement, "the defendant wins." *Duncan*, 27 Md. App. at 305.

## V.

## DISCUSSION

### A.

### Standing

The State is correct that the appellant, as the proponent of a motion to suppress, has the burden of establishing that the challenged seizure of the identification card and clothing violated his Fourth Amendment rights. However, the State incorrectly assumes, as to standing, that the ball started in the appellant's court without the prosecution having set it in motion. As explained, procedurally, the initial burden was on the prosecution to raise the challenge to standing. *See Coomes*, 74 Md. App. at 391–92. The State did not assert at the suppression hearing that the appellant lacked a legitimate expectation of privacy in the items seized, as the State now does for the first time on appeal. By not raising the standing

18

issue at the suppression hearing "by even the most informal of oral pleadings," the State failed to preserve it for appeal. *Thompson*, 62 Md. App. at 202–03.

*McCain v. State*, 194 Md. App. 252 (2010), is instructive. There, the State contended on appeal that the defendant did not have standing to contest a search of his wife's purse by police officers because he had no "expectation of privacy in the purse." *Id.* at 278. But at the suppression hearing, the State did not contend that he lacked standing. *Id.* We declined to consider the State's contention on appeal because, under Maryland Rule 8-131(a), "the issue was neither raised before, nor decided by, the circuit court[.]" *Id.*

We explained in *McCain* that we could consider the State's contention only through the exercise of the discretion conferred upon us by the Rule. *Id.* However, we declined to do so. *Id.* This was because "[w]hether a party has a legitimate expectation of privacy in another's property depends in part upon a consideration of the facts supporting the assertion of the expectation." *Id.* at 278–79. "Because the State did not raise the issue at the suppression hearing, there was no reason for [the defendant] to present such evidence, and he did not. Under these circumstances, consideration of the standing issue for the first time on appeal would be unfair to [the defendant]." *Id.* at 279; *see also McGurk v. State*, 201 Md. App. 23, 33–34 (2011) (relying on *McCain* in holding that, "by failing to raise the standing issue in the circuit court, the State waived that issue for appellate purposes"); *Feaster*, 206 Md. App. at 213–14 (declining to address the State's standing argument on appeal where the prosecution never challenged the defendant's standing to object to the police entry into or the search of a motel room in circuit court).

We reach the same conclusion in this case. Because the State did not contend that the appellant lacked standing to contest the seizure of the identification card and bloodied clothes at the suppression hearing, there was no reason for the appellant to present evidence that he had an expectation of privacy in the items seized; indeed, he did not present any such evidence. *See McCain*, 194 Md. App. at 278.

As Judge Moylan, writing for this Court, said in *Feaster*, "[t]here is no point in locking the barn door . . . once the horse is out. A failure of the State to raise a challenge to [the appellant's] standing at the suppression hearing operates as a waiver of the challenge." 206 Md. App. at 215. Accordingly, we will treat the appellant as if he had standing, and we turn to the merits of his Fourth Amendment claim. *See id.* (after concluding that the State's standing argument was not preserved, treating the defendant as if he had standing and turning to the merits of his Fourth Amendment claim).[8]

---

[8] The State notes in its brief that Maryland appellate courts have not analyzed whether an individual has a legitimate expectation of privacy in a hospital setting where a search and/or seizure occurred in connection with the individual's admission or treatment for a gunshot injury. The State cites various out-of-state cases to suggest that the appellant lacked a legitimate expectation of privacy in the seized items. *See Sheffield v. United States*, 111 A.3d 611 (D.C. 2015); *State v. Thompson*, 585 N.W.2d 905 (Wis. 1998); *United States v. Mattox*, 27 F.4th 668 (8th Cir. 2022); and *People v. Turner*, 248 N.E.3d 1006 (Ill. 2024).

In his reply brief, the appellant cites other cases to support the contention that he retained a possessory interest in the seized items and an expectation of privacy in his personal effects while in the hospital. *See United States v. Davis*, 657 F. Supp. 2d 630 (D. Md. 2009), *aff'd*, 690 F.3d 266 (4th Cir. 2012); *Commonwealth v. Silo*, 389 A.2d 62 (Pa. 1978); *United States v. Neely*, 345 F.3d 366 (5th Cir. 2003); *People v. Pearson*, 175 N.E.3d 773 (Ill. App. Ct. 2021); and *People v. Gill*, 103 N.E.3d 459 (Ill. App. Ct. 2018). Because the issue of the appellant's standing is not properly before us, the resolution of this seemingly novel issue will have to wait for another day.

**B.**

**Merits of the Fourth Amendment Claim**

**1. Collective Knowledge Doctrine**

We agree that the circuit court erred in finding that the warrantless seizure of the items was justified under the collective knowledge doctrine. The doctrine allows courts to measure probable cause in terms of the collective information within the possession of the entire police team. *Peterson v. State*, 15 Md. App. 478, 488 (1972); *see also Carter v. State*, 18 Md. App. 150, 154 (1973) ("[E]ven though an arresting officer personally may lack probable cause to justify an arrest, the State can show that the police team collectively possessed knowledge sufficient to establish probable cause.").

---

We observe, however, that there is consensus among courts regarding the difference between an infringement of one's privacy interest and interference with one's possessory interest. As mentioned, the Fourth Amendment "protects two types of expectations, one involving 'searches,' the other 'seizures.'" *Jacobsen*, 466 U.S. at 113. "A 'search' occurs when an expectation of privacy that society is prepared to consider reasonable is infringed," while "[a] 'seizure' of property occurs when there is some meaningful interference with an individual's possessory interests in that property." *Id.* "Therefore, to challenge a *search,* a defendant must demonstrate that he had a reasonable expectation of privacy in the premises or property searched." *Davis*, 657 F. Supp. 2d at 636. "However, to challenge a *seizure,* a defendant need only establish that the seizure interfered with his constitutionally protected possessory interests. The infringement of privacy rights, while often a precursor to a seizure of property, is not necessary to such challenge." *Id.* Stated differently, "the Fourth Amendment protects against unreasonable seizures of property in which the individual has a possessory interest, even if a privacy or liberty interest is not at issue." *Sheffield*, 111 A.3d at 619 (citing *Soldal*, 506 U.S. at 65–66 ("[T]he absence of a privacy interest notwithstanding, '[a] seizure of the article . . . would obviously invade the owner's possessory interest.'" (citation omitted)) and *Jones v. State*, 648 So.2d 669, 675 (Fla. 1994) ("[E]ven if we were to find that Jones'[s] privacy interests were in no way compromised, there clearly was a meaningful interference with his constitutionally protected possessory rights when his effects were seized without a warrant.")).

*Farrow v. State*, 233 Md. 526 (1964), involved an arrest by one police department based on a broadcast issued by another county's police department. In *Farrow*, a Baltimore City police officer interviewed the defendant's wife and then broadcast the description of the defendant and his vehicle, advising that the defendant was wanted for various crimes. *Id.* at 531. The Supreme Court of Maryland concluded that, because the broadcasting detective had probable cause, so, too, did the Anne Arundel County officers who ultimately made the arrest. *Id.* at 531–32. Even though the arresting officers "knew nothing about the probable cause[,] . . . they had received a 'look out' for the defendant from a responsible source," which was sufficient. *Id.* The Court explained, "If the police team working on the particular case had accumulated sufficient information to furnish probable cause for a reasonable man to believe that the alleged crime had been committed and that there was probable cause to believe that the defendant was involved therein, there was sufficient cause for his arrest." *Id.* at 532.

In *Peterson v. State*, 15 Md. App. 478 (1972), an undercover detective instructed other officers to arrest the occupants of two cars after he observed the occupants engaging in suspected drug transactions. *Id.* at 485. The arresting officers seized purses in or around the stopped vehicles and found heroin inside the purses. *Id.* at 486. The defense did not dispute the undercover detective's probable cause. *Id.* Instead, the defense challenged the detective's directive to another officer, who did not have knowledge of any facts to support a belief that the purse contained contraband, to make an arrest. *Id.* at 487–88.

We explained that, when analyzing the probable cause of an arrest ordered by an officer other than the arresting officer, we must trace the directive "back to its point of first

transmittal," and "the justification at that point of origin must be analyzed and found to be sound." *Id.* at 488. We further explained that "a police officer, with proper justification for an arrest or a search (with or without a warrant), may multiply his available arms and legs to execute his purpose by calling upon other police[ officers] to aid him." *Id.* at 487 (citing *Whiteley v. Warden of Wyo. Penitentiary*, 401 U.S. 560, 568 (1971)). The officer "does not have to impart to each of his executing agents the building blocks of probable cause that mounted up to his justification." *Id.* Although the arresting officer in *Peterson* did not possess knowledge of any facts that would amount to probable cause, because the undercover detective was part of the "police team," his "knowledge was attributable to the whole team," including the arresting officer. *Id.* at 489 (citing *Farrow*, 233 Md. at 531–32); *see also Reimsnider v. State*, 60 Md. App. 589 (1984) (reiterating that the arresting officer need not have probable cause for the arrest, where another member of the police team has probable cause and the arresting officer has been "alerted to make the arrest"; further explaining that, under the facts of the case, silence constituted a form of communication between the officers).

In *United States v. Massenburg*, 654 F.3d 480 (4th Cir. 2011), the U.S. Court of Appeals for the Fourth Circuit considered the application of the collective knowledge doctrine in deciding whether an officer had a reasonable, particularized suspicion that the defendant was engaged in criminal activity necessary to authorize a nonconsensual frisk during a street encounter with police. *Id.* at 483. In that case, police received an anonymous tip that shots had been fired in a high-crime area. *Id.* at 482–83. Officers Fries and Gaines responded to the call, split up, and patrolled the area in question. *Id.* at 483. Officer Fries

saw four men, including the defendant, walking on the street near the alleged origin of the shots. *Id.* Both officers converged on the men and began gathering information and asking if they had weapons. *Id.*

At the suppression hearing, Officer Fries testified that he had seen a small bulge in the defendant's jacket but had not alerted Officer Gaines of this. *Id.* Officer Gaines frisked the defendant and felt the handle of a firearm on the defendant's waistband. *Id.* The defendant was subsequently arrested and charged with possession of a firearm by a drug user. *Id.*

The defendant argued that Officer Gaines lacked reasonable, particularized suspicion to justify a nonconsensual frisk. *Id.* at 482. The Government suggested that, under the collective knowledge doctrine, Officer Fries's observation of a bulge in the defendant's jacket should be imputed to Officer Gaines to support particularized suspicion to justify the frisk, even though Officer Fries never informed Officer Gaines about it. *Id.* at 491. The Fourth Circuit rejected the argument. *Id.* at 495–96.

The Fourth Circuit articulated the collective knowledge doctrine as follows:

The collective-knowledge doctrine, as enunciated by the Supreme Court, holds that when an officer acts on an instruction from another officer, the act is justified if the instructing officer had sufficient information to justify taking such action herself; in this very limited sense, the instructing officer's knowledge is imputed to the acting officer.

*Id.* at 492 (citing *Whiteley*, 401 U.S. at 568 ("officers called upon to aid other officers in executing arrest warrants are entitled to assume that the officers requesting aid" had probable cause to support the warrant), and *United States v. Hensley*, 469 U.S. 221, 232 (1985) ("[I]f a flyer or bulletin has been issued on the basis of articulable facts supporting

24

a reasonable suspicion that the wanted person has committed an offense, then reliance on that flyer or bulletin justifies a stop . . . . If the flyer has been issued in the absence of a reasonable suspicion, then a stop in the objective reliance upon it violates the Fourth Amendment.")).

The doctrine, however, "has a limited domain: officers acting on the information and instructions of other officers." *Id.* Quoting *United States v. Laughman*, 618 F.2d 1067 (4th Cir. 1980), the Fourth Circuit explicitly delineated the limitations of the doctrine:

> The law seems to be clear that *so long as the officer who orders an arrest or search has knowledge of facts establishing probable cause,* it is not necessary for the officers actually making the arrest or conducting the search to be personally aware of those facts.
>
> [N.3] When a superior officer orders another officer to make an arrest, it is proper to consider the superior's knowledge in determining whether there was probable cause. Likewise, when a group of agents in close communication with one another determines that it is proper to arrest an individual, the knowledge of the group that made the decision may be considered in determining probable cause, not just the knowledge of the individual officer who physically effected the arrest.

*Massenburg*, 654 F.3d at 493 (quoting *Laughman*, 618 F.2d at 1072–73).

The Fourth Circuit rejected the Government's attempt to broaden the application of the doctrine by measuring reasonable articulable suspicion or probable cause based on the aggregate, uncommunicated knowledge of all officers involved. *Id.* In rejecting such a rule, the Fourth Circuit reasoned that, if it were to adopt the rule posited by the Government, "the legality of the search would depend solely on whether, after the fact, it turns out that the disparate pieces of information held by different officers added up to reasonable suspicion or probable cause." *Id.* The Fourth Circuit reiterated that

25

the collective-knowledge doctrine simply directs us to substitute the knowledge of the *instructing officer or officers* for the knowledge of the *acting officer*; it does not permit us to aggregate bits and pieces of information from among myriad officers, nor does it apply outside the context of communicated alerts or instructions.

*Id.* Accordingly, the Court refused to impute Officer Fries's observation of a bulge in the defendant's jacket to Officer Gaines, and it held that Officer Gaines lacked the reasonable suspicion required to conduct a lawful nonconsensual frisk. *Id.* at 495–96.

We return to the instant case. In denying the motion to suppress, the court determined that the collective knowledge of the PGPD and MPD officers justified the seizure of the items. However, the court erred in relying on the collective knowledge doctrine for two reasons. First, the evidence did not support the application of the collective knowledge doctrine. There was no evidence of a scenario like that in *Peterson*, where an officer who possessed sufficient information to support probable cause instructed an officer who lacked that information to make an arrest or, as in this case, to seize items. Nor did the evidence present a situation like that in *Farrow*, where an officer without independent knowledge of facts sufficient to establish probable cause made an arrest or, as in this case, seized items, based on communication from or with a team of officers who collectively knew facts sufficient to establish probable cause. *See Laughman*, 618 F.2d at 1072 n.3; *accord United States v. Wells*, 98 F.3d 808, 810 (4th Cir. 1996) ("[A]lthough the agent who actually seized the weapon pursuant to the supervising agent's instructions had no personal knowledge that [the defendant had committed a crime], it is sufficient that the agents collectively had probable cause to believe the weapon was evidence of a crime at the time of the seizure.").

Second, the collective knowledge doctrine did not resolve the appellant's argument. During the suppression hearing, the defense argued that the State failed "to justify a warrantless seizure," highlighting that an MPD officer had some involvement with the items before Detective Marks arrived. However, the specifics of this involvement were unclear, as the State did not present evidence to explain the antecedent events. In essence, the appellant argued that the State did not meet its burden of establishing both probable cause and that the warrantless seizure of items—by Detective Marks *and* by any other officer who may have previously performed a seizure—fell within one of the exceptions to the warrant requirement. After the court *sua sponte* relied on the collective knowledge doctrine to deny the suppression motion, defense counsel sought clarification regarding "which officer" and "the basis on which the officer seized the items." The court reiterated its reliance on the officers' collective knowledge. However, based on the evidence adduced at the suppression hearing, the collective knowledge of the officers did not establish probable cause or justify the seizure of the items under an exception to the warrant requirement. For the reasons stated, the court erred in finding that the warrantless seizure of the items was justified under the collective knowledge doctrine.

## 2. Plain View Exception to the Warrant Requirement

The State argues that the warrantless seizure of the items was nevertheless justifiable because the warrantless seizure fell under the plain view exception to the warrant requirement. The plain view exception permits law enforcement to seize an item if (1) the item is in plain view; (2) the officer's initial intrusion is lawful; (3) the incriminating character of the evidence is immediately apparent; and (4) the officer has a lawful right of

27

access to the object itself. *Glanden v. State*, 249 Md. App. 422, 432 (2021). "For the incriminating character of an item to be 'immediately apparent,' the officer, upon seeing the item, must have probable cause to believe that the 'item in question is evidence of a crime or contraband.'" *McCracken v. State*, 429 Md. 507, 516 (2012) (quoting *Arizona v. Hicks*, 480 U.S. 321, 323 (1987)); *see State v. Wilson*, 279 Md. 189, 195 (1977) (explaining that the "immediately apparent" element, "in essence, amounts to a requirement that police have probable cause to believe the evidence is incriminating before they seize it").[9] Specifically, the State argues that given the totality of the circumstances (Detective Marks's investigation and comparison of the videos, information about the walk-in shooting victim, seeing the identification card and the biohazard bag of bloodied clothing), it was a foregone conclusion that the clothes were evidence of a crime under the third requirement of the plain view doctrine.[10]

The appellant responds that the requirements of the plain view exception were not satisfied. He also focuses on the third requirement, arguing that the incriminating character of the evidence—bloodied clothing in a hospital—was not immediately apparent to

---

[9] The seizure took place in D.C., but the appellant was prosecuted in Maryland. Neither side raises an issue with any conflict of search-and-seizure law. *See Carroll v. State*, 240 Md. App. 629, 658 (2019) (discussing whether to apply the exclusionary rule of the state where the search occurred or the forum state). Both sides invoke the law of the forum state, Maryland.

[10] The State cites *United States v. Davis*, 690 F.3d 226 (4th Cir. 2012), to support its contention that Detective Marks's seizure of the appellant's clothes satisfied the "immediately apparent" prong of the plain view doctrine. For the reasons discussed below, we resolve this issue under the fourth element of the doctrine—whether the police had a lawful right of access to the clothing. Accordingly, we need not address the State's reliance on *Davis*.

Detective Marks because: Detective Marks lacked "independent discovery" or "initial recognition" of the appellant's clothing as incriminating; Detective Marks was unable to recall basic details about matching the clothes with what he observed on the liquor store video; and blood-stained clothes in a sealed hospital biohazard bag are inherently ambiguous and, alone, do not establish probable cause of criminal activity.

There is no merit to the State's plain view doctrine argument. Regarding the identification card, the evidence presented at the suppression hearing was that the MPD officer handed it to Detective Marks. The State does not attempt to justify Detective Marks's seizure of the identification card under the plain view doctrine, nor could it. It was evident that Detective Marks did not have "first-hand perception" of the card when he entered the hallway outside the operating room. *Brown*, 460 U.S. at 739.

Determining whether the bloodied clothing in the biohazard bag falls under the plain view doctrine requires a more in-depth analysis. While we agree with the appellant that the plain view doctrine does not apply under the circumstances of this case, the analysis does not depend on the element of incriminating character, as the parties suggest. Instead, the analysis hinges on the requirement that the officer must have a lawful right of access to the object seized under the fourth requirement of the plain view doctrine.

The Fourth Amendment requires that the "steps preceding the seizure" of evidence in plain view "be lawful." *Kentucky v. King*, 563 U.S. 452, 462–63 (2011) (explaining that "law enforcement officers may seize evidence in plain view, provided that they have not violated the Fourth Amendment in arriving at the spot from which the observation of the evidence is made"). "'Plain view' is perhaps better understood, therefore, not as an

independent 'exception' to the warrant clause, but simply as an extension of whatever the prior justification for an officer's 'access to an object' may be." *Brown,* 460 U.S. at 738–39; *Coolidge v. New Hampshire*, 403 U.S. 443, 466 (1971) ("The doctrine serves to supplement the prior justification[.]"). In other words, the plain view doctrine cannot justify the seizure of an object if it was put in plain view as a result of unlawful police conduct. *See Commonwealth v. Jackson*, 337 A.2d 582, 585 (Pa. 1975) ("Fundamental to the application of the 'plain view' doctrine is the principle that the seized objects must not have been put in plain view as a result of unlawful police conduct.") (citing *Harris v. United States*, 390 U.S. 234, 236 (1968)).

The evidence presented at the suppression hearing called into question the lawfulness of the steps preceding Detective Marks's seizure of the bag of bloodied clothing. The evidence suggested that the MPD officer had some involvement in the bag of clothing being placed in the hallway outside the operating room before Detective Marks found it there. When Detective Marks arrived, the appellant was already in the operating room. Detective Marks encountered the MPD officer outside the operating room. The MPD officer handed Detective Marks the appellant's identification card, which indicated that the MPD officer somehow came into possession of the card. Additionally, the MPD officer knew that the bag of clothing belonged to the appellant because he pointed it out to Detective Marks. In sum, the evidence raised concerns that the clothing's placement in the hallway—where Detective Marks later observed and ultimately seized it—might have resulted from a prior warrantless seizure by the MPD officer.

The State did not present any evidence regarding how the bag of clothing ended up in the hallway. We do not know whether hospital personnel placed it there or if the MPD officer seized it unlawfully from the medical staff and then left it in the hallway. If the latter occurred and, as a result, Detective Marks was able to view the bag of clothing, then Detective Marks did not have a lawful right of access to it when he seized it. Although the record may have supported that the incriminating character of the bloodied clothing was immediately apparent to Detective Marks, the evidence was insufficient to demonstrate that Detective Marks had a lawful right of access to the clothing in light of the indication that the MPD officer was involved with its placement in the hallway. *See Duncan*, 27 Md. App. at 305 ("Where the evidence is inconclusive in [establishing an exception to the warrant requirement], the defendant wins."); *see also Coomes*, 74 Md. App. at 388 (holding that evidence presented at the suppression hearing was insufficient to prove that the seizures were made pursuant to the plain view doctrine where the detective's testimony failed to establish the circumstances surrounding the seizure of items in the house).

In rejecting the State's plain view doctrine argument, we do not suggest that the State (or the testifying officer) must always explain how seized evidence ended up in the location where it was observed by the officer to prove that the item was properly seized under the plain view doctrine. Rather, we reaffirm the well-established rule that the State assumes the burden of overcoming the presumption of invalidity by demonstrating, "by however many steps are necessary," that the warrantless search and/or seizure satisfied one of the firmly established exceptions to the warrant requirement. *Graham*, 146 Md. App. at 349. The number of steps required varies depending on the facts of each case. In this case,

31

the apparent involvement of the MPD officer with the identification card and the bag of bloodied clothing prior to the clothing's seizure by Detective Marks necessitated that the State demonstrate, through however many steps were necessary, that the clothing was not placed in Detective Marks's plain view as a result of unlawful police conduct.

### 3. Inevitable Discovery

Alternatively, the State contends the evidence about the appellant's belongings was admissible based on the inevitable discovery exception to the exclusionary rule. The State contends that PGPD officers would have obtained information about the appellant's identity, which in turn would have led to the discovery of the Crosstour near the appellant's address. According to the State, this would have happened by way of securing a search warrant and due to the requirement that George Washington University Hospital report the appellant's identity to the police. Additionally, officers would have investigated the bag of bloodied clothing because the clothing matched that shown in both pieces of surveillance footage.

The appellant contends that he was deprived of an opportunity to rebut this argument below because the State did not raise the theory of inevitable discovery at the suppression hearing and that the State's arguments as to inevitability are speculative. We agree with the appellant.

The warrantless seizure of an object may be permissible if the State can show, by a preponderance of the evidence, that the evidence "*inevitably would have been* discovered through lawful means[.]" *Williams v. State*, 372 Md. 386, 410–11, 417 (2002). "[T]he question is whether that *very item of evidence* would have inevitably been discovered [i.e.,

32

the appellant's identification card], not merely whether *evidence roughly comparable* would have been so discovered [i.e., the facts contained on the card (name and address)]." Wayne LaFave, 6 *Search & Seizure: A Treatise on the Fourth Amendment*, § 11.4(a) (6th ed. Nov. 2024 update) (emphasis added).

"The analysis of what would have happened had a lawful search proceeded should focus on historical facts capable of easy verification, not on speculation." *Williams*, 372 Md. at 417–18. The "[a]pplicability of the inevitable discovery doctrine is a highly fact-based determination and involves review by a trial court whether the evidence in question would have been found." *Id.* at 424. "The emphasis on fact finding and the duty of the trial court is instructive, and demonstrates the limitation on the ability of an appellate court to decide a factual issue." *Elliott v. State*, 417 Md. 413, 437 (2010). "[A]bsent evidence relating to inevitable discovery, the doctrine should not be applied *sua sponte* because an appellate court's determination of the issue would be based on speculation rather than 'historical facts that can be verified or impeached.'" *Id.* (citation omitted); *see also Stokes v. State*, 289 Md. 155, 165–66 (1980) (holding that inevitable discovery was unavailable to State where there was no testimony as to usual police procedure and therefore no way to know whether police "would have, in fact" discovered the evidence absent the unlawful action).

Here, the theory of inevitable discovery was not raised by the State below. In addition (and perhaps as a result), there is not enough evidence in the record to show that the discovery of the appellant's identification card and the bag of bloodied clothing was inevitable. Given the factual void presented by the suppression record in the instant case,

making that determination in the first instance would necessarily involve speculation on our part. Accordingly, we decline to apply the doctrine to this case.

**CONCLUSION**

For the reasons stated, the circuit court erred in denying the appellant's motion to suppress evidence of the appellant's identification card and bloodied clothing. The State concedes that harmless error does not apply. Accordingly, we shall reverse the court's denial of the motion to suppress and remand for further proceedings consistent with this opinion, including a new trial.

Because we have decided to remand this case, we find it unnecessary to address the second issue that we review for plain error the unpreserved claim that the court erred in admitting the appellant's deposition testimony at trial. *See Pearson v. State*, 437 Md. 350, 364 n.5 (2014) ("Generally, where an appellate court reverses a trial court's judgment on one ground, the appellate court does not address other grounds on which the trial court's judgment could be reversed[.]"); *see also Morris v. State*, 153 Md. App. 480, 506–07 (2003) (noting that, in resolving contentions of plain error, the five words "[w]e decline to do so" are "all that need be said, for the exercise of our unfettered discretion in not taking notice of plain error requires neither justification nor explanation").

> **ORDER OF THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY DENYING THE MOTION TO SUPPRESS REVERSED; CASE REMANDED FOR FURTHER PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY PRINCE GEORGE'S COUNTY.**